THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDDIE L. ALEXANDER, Defendant-Appellant.

Fifth District    No. 5—02—0009

Opinion filed December 17, 2004.—Rehearing denied January 21, 2005.

Daniel M. Kirwan and Larry Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Bill Mudge, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Trent M. Marshall, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

In January 1996, Antonio Ray died after being struck by at least one vehicle on Highway 367 in St. Charles County, Missouri. His death was initially treated as a traffic fatality, possibly occurring as a result of intoxication. Late in 1999, police in Alton, Illinois, became aware that Ray's death may have been a homicide. In January 2000, the defendant, Eddie L. Alexander, was indicted on three counts of first-degree murder and one count of aggravated battery in the crime. The indictment charged that the defendant had beaten Ray and then left

him on the Missouri highway to be struck by vehicles. A jury convicted the defendant in April 2001. The defendant appeals, arguing that (1) he was not subject to prosecution in Illinois for murder because the murder occurred in Missouri, (2) he received ineffective assistance of counsel, (3) the statute of limitations (720 ILCS 5/3—5(b) (West 2002)) barred his prosecution for aggravated battery, (4) his aggravated battery conviction must be vacated because it was a lesser-included offense of murder, and (5) his aggravated battery sentence exceeded the permissible sentencing range for that crime. We affirm the defendant's conviction for murder, but we vacate his conviction and sentence for aggravated battery.

## I. BACKGROUND

On December 10, 1999, the State filed an information charging the defendant, Michael Tate, Brendon Wallace, and Ramando Alexander (who is the defendant's nephew) with one count each of murder (720 ILCS 5/9—1(a)(2) (West 1994)) in the January 1996 death of Antonio Ray. On January 13, 2000, a grand jury returned an indictment (which superceded the information) charging the defendant with three counts of first-degree murder (720 ILCS 5/9—1(a)(1), (a)(2), (a)(3) (West 1994)) and one count of aggravated battery (720 ILCS 5/12—4 (West 1994)). The indictment alleged that on or about January 19 or 20, 1996, the defendant committed the offense of first-degree murder in Madison County in that he beat Antonio Ray with the intent to do great bodily harm to him and then left Ray on a highway in St. Charles County, Missouri, where he would be struck by vehicles. Tate and Wallace each pled guilty to second-degree murder regarding Ray's death. Ramando Alexander pled guilty to unlawful restraint and was sentenced to 18 months in prison.

The defendant was tried before a jury in April 2001. The testimony adduced at the trial established that Antonio Ray had been severely beaten at the Alton, Illinois, home of the defendant and his former wife, Robin Alexander, on the evening of January 19, 1996. Several guests were present in the Alexanders' home that night, including Michael Tate, Brendon Wallace, Jeffrey Ewing, and Antonio Ray. The Alexanders and most of their guests were members of a gang called the Gangster Disciples. Ewing was the "governor" of the Gangster Disciples, and the defendant was the assistant governor. Ramando Alexander, who was a member of a different gang, was residing with the defendant and Robin Alexander at the time.

The violence began when Ray tried to steal money that Ewing was counting. There was some conflict in the testimony regarding exactly how many people participated in the beating, where in the house the

beating occurred, and whether the participants in the beating were armed with baseball bats and pistols or used only their hands. One witness testified that the beating occurred in the dining room, while the others testified that it took place in the kitchen. All of the witnesses who saw the beating testified that the defendant, Wallace, Tate, and Ewing beat Ray. According to Robin Alexander and Brendon Wallace, the other men who were present in the house took part in the beating as well. According to Ramando Alexander, Sherri Goree (who was Ewing's girlfriend at the time) joined Wallace, Tate, Ewing, and the defendant in beating Ray. Most of the witnesses testified that Ewing hit Ray in the head with his pistol. Some of the witnesses testified that the others used guns or baseball bats to hit Ray, while other witnesses testified that they saw only Ewing use an object to hit Ray. Robin Alexander testified that she did not know if anyone used anything other than their fists and feet to hit Ray. Gregory Taylor, who is the defendant's cousin and not a Gangster Disciples member, also testified that he saw no weapons being used.

All of the witnesses testified that Ray was beaten severely in the Alexanders' kitchen. One witness, Shanieka Mitchell, testified that he was covered in blood and "looked like he was dead already" and that he was lying on the floor unable to fight back while they beat him. Ramando Alexander, Robin Alexander, and Gregory Taylor all testified that Ray was on the ground unable to defend himself during the beating. Sherri Goree testified that Ray was knocked to the floor, but she stated that he tried to fight back. Only Michael Tate claimed that Ray was not knocked to the floor during the beating, but even he admitted that Ray "kind of staggered" and was not able to defend himself because he was badly outnumbered.

The testimony further showed that Ray was taken to the backyard of the Alexanders' home, where he was beaten again and shut in the trunk of Wallace's car. Again, there were conflicts in the testimony. Most of the witnesses testified that Tate and Wallace dragged Ray from the kitchen to the yard. Wallace testified that he carried Ray to the yard. Only Tate testified that Ray walked out the door. He stated that Ray recoiled from the group of men hitting him and that this "forced him out the back door." The testimony was uncontroverted that by the time the beating in the backyard was over, Ray was lying on the ground. Most of the witnesses stated that he was not moving, although Taylor testified that Ray was "squirming a little." Taylor and Ramando Alexander both testified that Tate and Wallace lifted Ray up and put him in the trunk of Wallace's car, although Ramando first testified that he could not remember whether it was Wallace or another man who helped Tate put Ray in the trunk. Wallace testified, "[Tate and I] just opened the trunk, and we—we helped him in."

After the beating, it was decided that Tate and Wallace were to take Ray to Missouri to kill him, although the testimony regarding exactly who said what is also in conflict. According to Wallace, Ewing ordered him and Tate to take Ray to Fourth Street and kill him there, but then the defendant told them to take him to Missouri instead. According to Tate, Ewing and the defendant told him and Wallace to take Ray to Fourth Street to kill him there, but they decided on their own to take him to Missouri instead because they were afraid they would be seen on Fourth Street. Taylor testified that he suggested taking Ray to the home of someone named Shalinda, who was Ray's girlfriend and Wallace's cousin, but that Wallace objected to that idea. Robin Alexander testified that the defendant told Wallace to "drop [Ray] off" across the bridge in Missouri. She later said that she heard the defendant say to "dump—and drop him off across." She further stated that the defendant referred to Ray as "the body." On cross-examination, she admitted that in her December 1999 statement to the police she stated that the defendant had told Wallace to put Ray in the car trunk and "take care of business across the river." On redirect, she clarified that he had said this in response to Tate asking if he could kill Ray. Although Ramando Alexander testified that the defendant did not order Wallace and Tate to kill Ray, he stated that the defendant ordered them to take "the body" out of his house.

Wallace and Tate both testified that they drove to Missouri with Ray in the trunk of Wallace's car. Both testified that they did not think that Ray's attempt to steal from Ewing warranted killing him and that they decided that they would disobey Ewing and the defendant's orders to kill him. They drove across the Clark Bridge and parked next to the side of Route 367. Wallace testified that he and Tate "let [Ray] out of the trunk" and then "just left him in the road" instead of killing him. He admitted, however, that Ray was not up and walking at that time and that when they left him in the road, they thought that he might be hit by a car. The prosecutor asked, "And that would solve the problem of you being ordered to kill him?" Wallace replied, "Yes."

Tate's account of what took place in Missouri was somewhat different from Wallace's account. According to Tate, he and Wallace "helped" Ray out of the trunk. Tate stated[:] "He was real woozy. He said a couple of words. He said, [']Mike, Brendon, please don't kill me.['] " Then, according to Tate, they let Ray go and he "walked a few steps" before falling down next to the shoulder of the road. Tate testified that the area was very dark and that Ray fell maybe five feet away from the highway "at the most." He further testified that he did not believe that Ray would be hit by a car but that when he returned

to the defendant's home in Alton, he told the defendant and Ewing that he and Wallace had taken care of their "business."

On April 6, 2001, the jury returned verdicts of guilty of first-degree murder and aggravated battery. On October 30, 2001, the court sentenced the defendant to 40 years in prison on each charge, to be served concurrently. On November 28, 2001, the defendant filed a motion to reduce his sentence, arguing that his 40-year sentence would cause undue hardship to his family and was disproportionately harsh compared with the sentences received by codefendants Wallace and Tate. The court denied the motion on December 18, 2001. The defendant filed his notice of appeal on January 3, 2002.

On October 23, 2003, the defendant filed a motion in this court to supplement the record on appeal, which we ordered taken with the case on November 13, 2003. We now grant the defendant's motion.

## II. ANALYSIS

### A. The Aggravated Battery Conviction

■ The defendant raises several issues with respect to his aggravated battery conviction. The State concedes that the aggravated battery conviction must be vacated because it was a lesser-included offense of first-degree murder. We agree. See *People v. Smith*, 183 Ill. 2d 425, 431-32, 701 N.E.2d 1097, 1100 (1998); *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844 (1977). Because we vacate the defendant's conviction and sentence for aggravated battery, we need not address the other issues raised with respect to this conviction.

### B. Illinois Jurisdiction Over the Murder Charge

■ The defendant first contends that the trial court lacked jurisdiction to convict him. This argument has three components. First, the defendant contends, the indictment was fatally defective in that it failed to allege that the murder occurred even partly within the State of Illinois. Second, he contends that the State failed to prove beyond a reasonable doubt that a part of the crime occurred in Illinois. Third, he argues that his conviction must be reversed because the jury was not instructed that in order to convict the defendant, it had to find that at least a part of the crime occurred in Illinois. We reject all three contentions.

The indictment charges, in relevant part, as follows:

"EDDIE L. ALEXANDER[,]
on or about January 19-20, 1996, *at and in the County of Madison, in the State of Illinois,* committed the offense of:
COUNT I: FIRST[-]DEGREE MURDER in that said defendant, without lawful justification, and with the intent to do great bodily

harm to Antonio Ray, beat Antonio Ray[ ] *and then* left Antonio Ray upon Highway 367, St. Charles County, Missouri, where he would be struck by vehicles, thereby causing the death of Antonio Ray, in violation of 720 ILCS 5/9—1(a)(1) [(West 1994)]." (Emphases added.)

On its face, the indictment alleges that the acts constituting the murder—with the exception of leaving Ray on the Missouri highway—occurred in Madison County, Illinois. The indictment charges that the defendant committed the offense of first-degree murder in Madison County and does not mention any other location until after the words "and then." Giving the indictment its most logical reading, then, it charges that all the actions constituting the offense of murder took place in Illinois—except for the final act of leaving Ray on the highway in Missouri. While it might have been better to have stated in the body of count I itself that the beating had taken place in Madison County, we think it would be irrational to interpret the charge to mean that the defendant committed the murder in Madison County, Illinois, by beating Ray at some undisclosed location and then leaving him on a highway in St. Charles County, Missouri. The indictment, on its face, raises no *genuine* jurisdictional issue.

The defendant further contends that the State failed to prove beyond a reasonable doubt that the acts perpetrated in Illinois caused Ray's death. See *People v. Holt*, 91 Ill. 2d 480, 492, 440 N.E.2d 102, 108 (1982) (stating that jurisdiction must be proven beyond a reasonable doubt). There is no dispute that the ultimate cause of Ray's death was the severe cranial injuries he suffered when he was hit by at least one vehicle on the Missouri highway. We note that there was some evidence to support a finding that Ray died directly as a result of the beating before he was taken to Missouri. Ramando Alexander testified that the defendant told Tate and Wallace to "get the body" out of his house and that it was Ramando's understanding that Ray was to be "dumped" somewhere. Robin Alexander also testified that she did not know whether Ray was dead or alive when he was put in the trunk of Wallace's car, and she stated that the defendant referred to him as "the body" when the defendant ordered Wallace and Tate to take him across the bridge. However, most of the evidence suggested that Ray was alive when he was taken to Missouri, and the State merely takes the position that the murder occurred *partly* in the State of Illinois.

A defendant is subject to prosecution in Illinois for a criminal offense if it is "committed either wholly or partly within the [s]tate" (720 ILCS 5/1—5(a)(1) (West 2002)) or if conduct within this state "constitutes an attempt, solicitation[,] or conspiracy" to commit an offense in another state that is a criminal offense in both states (720

ILCS 5/1—5(a)(4) (West 2002)). An offense is committed partly in Illinois if either the conduct or a result that constitutes an element of the offense occurs within Illinois. 720 ILCS 5/1—5(b) (West 2002). In this case, Ray's death, which was a result constituting an element of the offense of first-degree murder (see 720 ILCS 5/9—1(a)(1) (West 1994)), occurred in Missouri. The issue, then, is whether the beating, which occurred in Illinois, constituted an element of the offense as well. To sustain a conviction for first-degree murder, the State must show (1) that a defendant performed acts which caused the death of the victim and (2) that the defendant intended to cause death or great bodily harm or knew that his or her actions would cause death or created a strong probability of death or great bodily harm. 720 ILCS 5/9—1(a)(1), (a)(2) (West 1994). At issue here is whether the defendant's actions in Illinois caused Antonio Ray's death.

The defendant acknowledges, as he must, that in order for the State to prove jurisdiction, the State need not establish that Ray's death was caused *entirely* by actions occurring in Illinois. See 720 ILCS 5/1—5(a)(1) (West 2002) (Illinois has jurisdiction over a crime that occurred "wholly or partly within the [s]tate"); *Holt*, 91 Ill. 2d at 485, 440 N.E.2d at 104 (noting that "[j]urisdiction would be proper even if less than all the criminal activity took place in Illinois, *provided enough did to constitute a criminal attempt*" (emphasis added), citing *People v. Werblow*, 241 N.Y. 55, 148 N.E. 786 (1925)). He argues, however, that the beating inflicted in Illinois did not constitute a part of the crime because the State did not prove that it caused Ray's death. We reject this contention.

Even if we view the evidence in the light most favorable to the defendant, it is clear that the beating was a contributing cause of Ray's death. The defendant contends that some of the evidence showed that Ray was "walking and talking" in Missouri. This statement, which refers to Tate's testimony, mischaracterizes the evidence. Tate specifically testified that Ray "was real woozy" when they arrived in Missouri and that he "walked a few steps" and then fell down next to the roadway. While the testimony varied considerably regarding the exact progression of the events at the defendant's home, no testimony refuted the fact that Ray was savagely beaten and taken away in the trunk of Wallace's car, nor did any testimony refute the fact that the defendant participated in that beating. Further, a passenger in the car that struck Ray testified that she did not see him until after the car hit him, and there was a stipulation that, if called, another motorist would testify that he swerved to avoid hitting a man he saw lying in the center of the road, where Ray's body was later found. To conclude that Ray lay down in the center of the highway in the path of oncom-

ing traffic of his own accord—or that he remained lying on the highway for any reason other than that he was too weak to get up as a result of the beating—would be ludicrous.

Even assuming that the jury accepted Tate's testimony that Ray fell down next to the road, rather than Wallace's testimony that they deliberately left Ray in the roadway itself, does not eliminate the causal connection between the beating and Ray's death. Tate testified that Ray fell down no more than five feet from the side of the highway in a darkened area in a "woozy" condition. The danger inherent in this situation is obvious. If Wallace and Tate did not place the badly injured Ray in the middle of the highway, where his body was found, he could only have gotten there by falling onto the highway attempting to flag down a passing motorist for aid, a situation just as causally connected to the "woozy" condition caused by the beating in Illinois as the more likely explanation that he had been left in the middle of the highway and was unable even to crawl off.

The defendant contends that, under the Illinois Supreme Court's decision in *Holt*, these facts are insufficient to establish Illinois jurisdiction. We find *Holt* distinguishable. There, the defendant was tried in Illinois for aggravated kidnaping and felony murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3)). The State originally charged him with intentional murder as well as felony murder, but the trial court dismissed the intentional murder charge because the evidence showed that the victim had been strangled to death only in Wisconsin. *Holt*, 91 Ill. 2d at 483, 440 N.E.2d at 103. In holding that Illinois lacked jurisdiction over the felony murder charge, the supreme court explained that the predicate felony underlying a felony murder charge acts as a substitute for the actual intent required for intentional murder. *Holt*, 91 Ill. 2d at 485, 440 N.E.2d at 104. If a defendant formed an actual intent to kill in Illinois but did nothing in furtherance of this intent before leaving the state, Illinois would not have jurisdiction. Likewise, forming the constructive intent to kill in Illinois by committing the predicate felony here does not confer jurisdiction on Illinois courts. *Holt*, 91 Ill. 2d at 486, 440 N.E.2d at 104.

The court further explained that the kidnaping, although it was a related crime, could not support Illinois jurisdiction because "it is not enough that some part of a course of criminal conduct, *some related crime*, be committed in Illinois; the *particular crime charged* must be committed partly within this [s]tate." (Emphases added.) *Holt*, 91 Ill. 2d at 484, 440 N.E.2d at 104. The beating that occurred in the case at bar was not merely a part of a related series of actions which constituted separate crimes. Rather, it was an integral part of the offense charged. Had Ray not been debilitated to the point where he was

unable to get out of the roadway under his own strength due to the beating in Illinois, Wallace and Tate could not have killed him without doing more than they did in Missouri. There was no evidence that Ray had been pushed in front of an oncoming car or that he had been restrained in any manner other than by the condition in which the beating left him. This stands in stark contrast to the situation in *Holt* where the defendant engaged in actions that caused his victim's death by strangulation entirely in Wisconsin. Had Holt strangled his victim when he first encountered her at a Kenosha, Wisconsin, bar (see *Holt*, 91 Ill. 2d at 482, 440 N.E.2d at 103), he could have caused her death without first kidnaping her from her parents' home in Illinois by doing no more than he actually did in Wisconsin. By contrast, had Tate and Wallace transported Antonio Ray to Missouri without first, along with the defendant and Ewing, beating him in Illinois, they would have had to do something more than they did in Missouri to cause his death; otherwise, he could have avoided being run over by simply walking away.

The *Holt* court recognized this distinction, going out of its way to point out that a felony might support jurisdiction over a felony murder charge "if there were some intrinsic relation between it and the death *** so that one could say realistically that the felony caused the death." *Holt*, 91 Ill. 2d at 486, 440 N.E.2d at 104-05. For the reasons we have stated, we can realistically say that the beating Ray suffered in Illinois caused his death even though it was most likely not the only or even most direct cause of his death.

Further, as noted, the *Holt* court pointed out that conduct within Illinois must at least amount to an attempt to commit the felony in order to support Illinois jurisdiction. See *Holt*, 91 Ill. 2d at 485, 440 N.E.2d at 104. Given the severity of the beating and the undisputed fact that Ray was outnumbered 4 to 1, we find that if Ray had not been struck by vehicles and had recovered from his injuries, the beating alone would support a prosecution for attempted murder. See 720 ILCS 5/8—4(a) (West 1994) (defining attempt as taking any substantial step toward the commission of an offense with the intent to commit that offense).

Moreover, as the State correctly points out, Illinois jurisdiction over a crime that occurred wholly in Missouri could also be established by the evidence that the defendant ordered Wallace and Tate to kill Ray in Illinois. See 720 ILCS 5/1—5(a)(4) (West 1994) (providing that Illinois has jurisdiction where conduct within this state constitutes solicitation to commit an offense in another state). In order for the jury to find the defendant guilty of Ray's murder, it had to find either that he had solicited the murder or that the beating constituted a part

of the murder—or both. There were no allegations in the indictment and no evidence presented at the trial to show that the defendant had done anything in furtherance of this crime anywhere other than Illinois. Thus, we find that the State provided sufficient evidence to prove beyond a reasonable doubt that Illinois had jurisdiction over this crime under at least one—if not both—of those subsections.

As the defendant correctly contends, however, whether the crime occurred partly in Illinois is a question of fact. He argues that this question should have been submitted to the jury and that counsel was ineffective for failing to request a jury instruction informing the jury that it must find beyond a reasonable doubt that at least a part of the murder occurred in Illinois. In order to succeed on a claim of ineffective assistance of counsel, the defendant must show both that counsel's performance fell below an objective standard of professional reasonableness and that but for counsel's professional errors, the outcome of the defendant's trial might have been different. *People v. Ortiz*, 224 Ill. App. 3d 1065, 1070, 586 N.E.2d 1384, 1387 (1992). As we have explained, in order to convict the defendant, the jury needed to find that he solicited the murder in Illinois or that the act of beating Ray in Illinois formed a part of the murder. Because the jury *necessarily* found beyond a reasonable doubt at least one of the facts required to support Illinois jurisdiction, the result would have been no different had the instruction been given.

### C. Ineffective Assistance of Counsel

■ The defendant next contends that his murder conviction must be reversed because he received ineffective assistance of counsel. He argues that defense counsel was ineffective because (1) he failed to challenge Illinois's jurisdiction over the murder charge, (2) he failed to raise the statute of limitations as an affirmative defense to the charge of aggravated battery, (3) he did not object to a police officer's testimony that the murder occurred in Madison County, (4) he did not adequately confront Tate and Wallace with the full extent of the benefits they received pursuant to plea agreements, and (5) he failed to object to two hearsay statements that were admitted.

We evaluate claims of ineffective assistance of counsel under the standard annunciated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). *People v. Moore*, 279 Ill. App. 3d 152, 156-57, 663 N.E.2d 490, 494-95 (1996). The *Strickland* test has two components. First, a defendant contending that he received ineffective assistance of counsel must demonstrate that

counsel's performance was deficient. *Moore*, 279 Ill. App. 3d at 157, 663 N.E.2d at 495. To do so, the defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Although counsel's conduct is afforded a strong presumption that it constitutes sound trial strategy (*Moore*, 279 Ill. App. 3d at 157, 663 N.E.2d at 495), this presumption may be overcome where no reasonably effective criminal defense attorney, confronting the circumstances of the defendant's trial, would engage in similar conduct (*People v. Fletcher*, 335 Ill. App. 3d 447, 453, 780 N.E.2d 365, 370 (2002)).

To prevail on an ineffective-assistance-of-counsel claim, a defendant must also demonstrate that, but for counsel's deficient performance, there is a reasonable probability that the result of the trial would have been different. *Moore*, 279 Ill. App. 3d at 159, 663 N.E.2d at 496, citing *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69. In other words, the defendant must demonstrate that he was actually prejudiced by the ineffective representation he received. *Moore*, 279 Ill. App. 3d at 157, 663 N.E.2d at 495. To make this showing, the defendant need not show that the evidence that is not attributable to defense counsel's errors would have been insufficient to sustain the conviction. *Moore*, 279 Ill. App. 3d at 160, 663 N.E.2d at 497. Rather, the defendant need only show that it is plausible that the result of the trial would have been different absent counsel's unprofessional errors. *Fletcher*, 335 Ill. App. 3d at 455, 780 N.E.2d at 371. If it is easier to demonstrate that the claimed errors could not have prejudiced the defendant, a reviewing court may affirm the defendant's conviction on that basis alone. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

We may dismiss the first three claimed errors at the outset. Because we have concluded that Illinois had jurisdiction over the murder charge, counsel was not ineffective for failing to challenge the indictment on this ground. See *People v. Singleton*, 217 Ill. App. 3d 675, 689, 577 N.E.2d 838, 847 (1991) (noting that trial counsel is not ineffective for failing to make a useless objection). Because we have vacated the defendant's aggravated battery conviction, his contention that counsel was ineffective for failing to raise the statute of limitations is moot. The defendant's complaint regarding the police officer's testimony that the murder occurred in Madison County is that this "bare opinion testimony" helped to establish Illinois jurisdiction. Because Illinois jurisdiction was proper, the defendant cannot claim he suffered any prejudice from this admittedly conclusory testimony.

The defendant's next contention of error concerns counsel's al-

leged failure to confront Wallace and Tate with the full extent of the deals they made pursuant to their negotiated plea agreements. He argues that plea agreements they had entered into, both in unrelated prior convictions and in their convictions for Ray's murder, resulted in void sentencing orders which the State could seek to revoke at any time, thereby exposing Wallace and Tate to the possibility of receiving harsher sentences. See *People v. Wade,* 116 Ill. 2d 1, 4-5, 506 N.E.2d 954, 955 (1987) (an order sentencing a defendant to probation after a negotiated guilty plea was vacated when a probation officer informed the court that the defendant had a prior conviction, making him ineligible for probation). According to the defendant, this situation created an incentive for Wallace and Tate to implicate the defendant that is far stronger than the incentive a codefendant who has pled guilty ordinarily has to testify for the State. Because a void sentencing order may be challenged at any time, the defendant argues, the State could pressure Wallace and Tate into falsely implicating the defendant by threatening to challenge their sentences if they do not cooperate. See *People v. Muschio,* 278 Ill. App. 3d 525, 528-29, 663 N.E.2d 93, 95 (1996) (where the State engaged in such a tactic).

A comparison of *Muschio,* cited by the defendant, to the case at bar demonstrates the flaws inherent in the defendant's argument. There, one codefendant pled guilty and received a seven-year sentence for an offense carrying a mandatory minimum sentence of nine years. *Muschio,* 278 Ill. App. 3d at 528, 663 N.E.2d at 95. During the course of the second codefendant's trial, the prosecutor stated that he had learned that the defense intended to call the first codefendant as a witness. If that was true, the prosecutor said, the State " 'would be making an oral motion to reconsider' " the sentence given to the first codefendant pursuant to his plea agreement because it was illegally low. *Muschio,* 278 Ill. App. 3d at 528, 663 N.E.2d at 95. The codefendant stated on the record that he did not testify because he did not want to serve two additional years in prison. *Muschio,* 278 Ill. App. 3d at 529, 663 N.E.2d at 95. The appellate court found that this tactic amounted to witness intimidation. *Muschio,* 278 Ill. App. 3d at 530, 663 N.E.2d at 96.

Here, by contrast, there is no evidence of any such tactics on the part of the State; there is only a complex legal argument that such pressure could, theoretically, be placed on Wallace and Tate. That argument is as follows. Wallace pled guilty to a charge that he committed the offense of armed violence (720 ILCS 5/33A—2 (West 1994)) when, while armed with a dangerous weapon, he was accountable for a first-degree murder committed by another. Because first-degree murder cannot serve as the predicate felony for armed violence (see

*People v. Hobbs*, 249 Ill. App. 3d 679, 683, 619 N.E.2d 258, 261 (1993)), the defendant argues that the court had no authority to accept Wallace's guilty plea and that the State could seek to vacate it at any time. Tate pled guilty to second-degree murder in a previous case in which he had been originally indicted on charges of first-degree murder for shooting a man in the head. The indictment was subsequently amended by interlineation to charge Tate with second-degree murder and include allegations that he believed at the time of the killing that circumstances existed that would have justified or exonerated the killing had they been true. The defendant contends that because an indictment may not be substantively amended except by a grand jury (see *People v. Kelly*, 299 Ill. App. 3d 222, 227, 701 N.E.2d 114, 117 (1998)), the second-degree-murder conviction entered on Tate's guilty plea was void and subject to challenge by the State at any time. In Ray's murder, both Tate and Wallace pled guilty to second-degree murder after similar amendments were made to their indictments. The defendant contends that no factual basis existed for finding that they could have had an imperfect defense to first-degree murder that would entitle them to a second-degree-murder instruction had they been tried by juries rather than plead guilty and that, as a result, their sentences for second-degree murder in Ray's death were also subject to attack at any time.

We need not determine whether the defendant is correct in his assertion that the State, even theoretically, could use any of these plea bargains to threaten Wallace and Tate to implicate the defendant. Any cross-examination of these witnesses on the complexities of their plea bargains would have been far less effective than the cross-examination defense counsel actually conducted. Defense counsel got Wallace to admit on cross-examination that he had received two concurrent murder sentences (although the previous sentence was actually for armed violence). Wallace further admitted that he could have been sentenced to natural life in prison for the murder of Antonio Ray, the second of the two murders, absent his plea agreements but was instead sentenced to only 35 years. He further admitted that his sentence for Ray's murder extended the time he was already sentenced to spend in prison by only 10 years. Defense counsel emphasized how beneficial Wallace's plea in the instant case was. Moreover, Wallace denied making a plea agreement that included his testimony against the defendant, even after he admitted he had received such favorable treatment, a lie defense counsel was able to use to further impeach his credibility. Although defense counsel never asked Tate whether he could have been sentenced to natural life absent his guilty pleas, Tate admitted on cross-examination that his concurrent sentence for Ray's

murder would not extend the time he was to serve in prison on the previous murder charge at all. Defense counsel told the jury: "[The State has] cut a deal with Mr. Tate for his testimony. They cut a deal so sweet for him, he's not going to serve any more time than he [was] already going to serve. He got a free pass."

Telling the jury that Tate essentially got away with murder and that Wallace was avoiding a life sentence has far more impact than explaining the nuanced details of how the State theoretically could have exerted pressure over these two witnesses by threatening to challenge plea agreements it had previously negotiated with them. Moreover, the latter strategy, the one the defendant argues on appeal trial counsel should have engaged in, might well have backfired. In the absence of any evidence that the State was using their sentences in unrelated prior cases to threaten Wallace and Tate to testify against the defendant, the inherently confusing argument that the State had the power to do so might well have appeared to the jury to be nothing more than a far-fetched conspiracy theory. Counsel was not ineffective for cross-examining Wallace and Tate in the manner he did.

Finally, the defendant contends that defense counsel was ineffective for failing to object to two alleged hearsay statements. One of these statements was admitted without objection when Shanieka Mitchell testified that she heard the defendant tell Wallace and Tate to put Ray in the trunk of Wallace's car. On cross-examination, she admitted that Robin Alexander's 13-year-old cousin had overheard the defendant tell the men to put him in the trunk and relayed this to Mitchell. Although Mitchell's testimony, if believed, would not establish the fact that the defendant ordered Wallace and Tate to kill Ray, it did add some credibility to the testimony that the defendant gave the order. However, considering the totality of the circumstances, we do not find that it prejudiced the defendant. Several witnesses testified that the defendant either ordered Wallace and Tate to kill Ray or ordered them to do the killing in Missouri rather than in Alton after Ewing had given the initial order to kill. The only witness who gave any truly exculpatory testimony in this regard was Gregory Taylor, the defendant's cousin. The defendant's former wife and his nephew both testified that the defendant ordered "the body" to be "dumped" or "dropped off" in Missouri. Further, the testimony that the defendant was the assistant governor of the Gangster Disciples with the authority to issue such an order *was* uncontroverted. Moreover, defense counsel effectively used the fact that Mitchell lied about hearing the order personally to challenge the credibility of her far more damaging testimony. Specifically, Mitchell testified that she had seen the defendant, along with Ewing, Tate, and Wallace, beating

Ray, that the men were using guns and baseball bats to beat him, and that Ray "looked like he was dead" before Tate and Wallace even dragged him into the backyard.

The other statement of which the defendant complains was contained in a stipulation that was read into evidence. The stipulation stated that, if called to testify, Dr. Mary Case, the medical examiner who performed an autopsy on Ray in 1996, would testify, in relevant part, as follows:

"Antonio Ray died of crania-cerebral trauma.

Also present were abrasions of the left elbow, left hand, knees, shoulders, left side back[,] and right chest. Ray had a rib fracture on the right 10th rib.

The cause of death *is stated as* blunt trauma at the hands of another and then struck by a motor vehicle." (Emphasis added.)

The jury requested both the original autopsy report and the stipulation regarding what Dr. Case would testify to; however, the autopsy report itself was never entered into evidence, and defense counsel objected to sending the stipulation to the jury room on the grounds that the stipulation was the equivalent of Dr. Case's testimony. The court sustained the objection.

We first note that the meaning of this stipulation that the cause of death "is stated as" blunt trauma followed by being hit by a motor vehicle is not at all clear. It could mean "Dr. Case states that"—in which case, since the stipulation is the equivalent of her testimony, it is not hearsay but simply a poorly worded description of what she would testify to if called. It could mean "Dr. Case would testify that 'it is stated' in the autopsy report"—which would be admissible under an exception to the hearsay rule for coroners' reports. See 725 ILCS 5/115—5.1 (West 2002). In all likelihood, the original autopsy report did not contain any such statement because the Missouri police who investigated Ray's death in 1996 considered it a traffic accident. The statement is at best confusing and at worst potentially misleading. Defense counsel should have objected. We find that it resulted in no prejudice to the defendant, however. The stipulation was not sent back to the jury room, although all the requested exhibits were. It is highly unlikely that an isolated statement read into evidence near the beginning of a three-day trial was more persuasive to the jurors than the overwhelming evidence that Ray was severely beaten by at least four men and left badly injured in the middle of a highway where it was too dark for motorists to see him. We conclude that the claimed errors did not amount to ineffective assistance of counsel.

## III. CONCLUSION

For the foregoing reasons, we affirm the defendant's conviction for

first-degree murder, but we vacate his conviction and sentence for aggravated battery.

Motion granted; judgment affirmed in part and vacated in part.

WELCH and GOLDENHERSH, JJ., concur.