2020 IL App (1st) 171093-U

No. 1-17-1093

Order filed October 13, 2020

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 8708 |
| | ) | |
| MICHAEL SUGGS, | ) | Honorable |
| | ) | Thomas M. Davy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1  *Held*: Defendant's conviction for unlawful use of a weapon by a felon is affirmed over his contention that his trial counsel was ineffective for failing to object to a witness's testimony as hearsay.

¶ 2  Following a bench trial, defendant Michael Suggs was convicted of unlawful use of a

weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2016)) and sentenced to nine years and

six months in prison. On appeal, defendant contends that his trial counsel was ineffective for failing to object to a police officer's hearsay testimony. For the reasons that follow, we affirm.[1]

¶ 3    Defendant's conviction arose from the events of May 20, 2016. Following his arrest, defendant was charged by indictment with four counts of UUWF and four counts of aggravated unlawful use of a weapon (AUUW).

¶ 4    At trial, Chicago police officer Dejuan Turner testified that on the day in question, he was working in a covert capacity monitoring a funeral of a gang member. Turner, who was wearing civilian clothes and sitting in a parked unmarked car, was about a quarter of a block from the church where the funeral was being held. About 11:17 a.m., he saw defendant, whom he knew by name and identified in court, walking away from the church with Javonte Edmond, Darrin Nelson, and a man Turner did not know. The group approached a parked silver Pontiac Grand Prix that Turner described as being approximately 50 feet away, "on a 45-degree angle from me directly across the street." Defendant got into the front passenger seat, Nelson got into the driver's seat, and Edmond got into the back seat. Turner could see clearly through the front windshield of the Grand Prix.

¶ 5    Defendant closed his car door and rolled down his window. At this point, the fourth man in the group, who was on the sidewalk, handed defendant a dark object through the window. Based on his past experience with firearms, Turner believed the object was a handgun. Specifically, he saw the handgun's handle and noticed the handgun was blue steel in color. Defendant rolled up his window and the man on the sidewalk walked away.

---

[1] We note that defendant has an appeal pending in a related postconviction proceeding in appeal No. 1-18-2243.

¶ 6     As the Grand Prix pulled away from the curb and drove past Turner, he noted its license plate number. He radioed for an enforcement car to stop the Grand Prix immediately. He then began following a marked police car and an unmarked car that were behind the Grand Prix. Although the marked car activated its lights and sirens, the Grand Prix made a turn and continued at a high rate of speed. Eventually, additional units arrived and the Grand Prix was curbed. Via radio communication, Turner provided information to the other officers regarding what he had observed. He subsequently learned that a handgun had been recovered. When the other officers showed Turner the recovered handgun, he recognized it as the object he had seen the man on the sidewalk hand to defendant through the window of the Grand Prix. Turner also identified the handgun in court.

¶ 7     Chicago police officer Henrietta Parker testified that she was on duty in a marked squad car on the day of the funeral. About 11:17 a.m., she was parked across the street from the church when she heard a radio transmission requesting a marked unit to follow and pull over a silver car with a particular license plate. She began following a silver Grand Prix, confirmed over the radio that its plate number matched, and activated her emergency equipment, which in turn activated her dashboard camera. The Grand Prix slowed down and pulled to the right, but then accelerated and continued driving. Other police cars joined the pursuit and eventually the surrounding traffic slowed enough that Parker was able to drive around the Grand Prix, cut in front of it, and stop it. In court, Parker viewed video footage from her dashboard camera and agreed it accurately depicted her pursuit of the Grand Prix.

¶ 8     Chicago police officer James Whigham testified that he and his partner, Sergeant Dennis O'Brien, had been assigned to monitor the gang funeral in their unmarked car. About 11:17 a.m.,

Whigham heard a radio transmission "to put a traffic stop on a silver Pontiac Grand Prix" because there was a handgun in the car. Whigham and his partner went to the location specified in the radio call and joined several other police cars in their pursuit of the Grand Prix. The Grand Prix accelerated but eventually stopped when Parker blocked its path.

¶ 9    As Whigham and O'Brien exited their car, O'Brien was in radio communication with Turner, who had put out the "stop request" on the Grand Prix. Defendant, whom Whigham identified in court, was in the front passenger seat of the Grand Prix. Whigham later learned that the driver was Nelson and the back-seat passenger was Edmond. Whigham did not recall where in the back seat Edmond was seated.

¶ 10    After the three men stepped out of the vehicle, Whigham "learned from the radio communication to Sergeant O'Brien that there was a gun in the vehicle." Whigham looked underneath the front passenger seat and observed a handgun. He explained that this was the first place he looked "[b]ecause that was the information I received where the gun was at." When asked for clarification, Whigham agreed that the information he received was that the front-seat passenger was the individual who had a handgun. Using rubber gloves, Whigham recovered the handgun, which was a fully loaded Taurus .40-caliber semiautomatic handgun.

¶ 11    On cross-examination, defense counsel asked Whigham what brought his attention to the area under the front passenger seat. Whigham answered, "The radio transmissions from Officer Turner and the [*sic*] from talking to my Sergeant, O'Brien, [who] was telling me that the front passenger had received a handgun." Whigham also stated that the radio transmissions "kept on going on and on" about the handgun.

¶ 12    A Chicago police evidence technician testified that there were no suitable prints on the handgun for comparison. The parties stipulated that defendant had never been issued a Firearm Owner's Identification (FOID) card or concealed carry license, that he was a convicted felon, and that he was on parole at the time of the offense. The State entered into evidence certified copies of defendant's prior convictions for AUUW and unlawful possession of a firearm by a gang member on December 14, 2015, and unlawful possession of a firearm by a gang member on March 25, 2016. The State rested and the trial was commenced and continued.

¶ 13    When the case resumed, the trial court confirmed with counsel that the defense intended to call as a witness Edmond, "who in response to questions may or may not implicate himself to the offense." The trial court appointed an attorney to speak with Edmond and passed the case. After the case was recalled, Edmond's counsel stated it was Edmond's "intent to take the Fifth if he's called to testify this afternoon" but "that he would perhaps change his position on a later date *** if he had an opportunity to get his personal affairs in order." Edmond's counsel agreed that it was "absolutely one of [Edmond's] concerns" that he would be arrested if he testified. Following further discussion between the court and the attorneys, the court admonished Edmond that his subpoena was continued to the next week, specifically, October 24, 2016.

¶ 14    The defense then called Officer Turner and questioned him as follows regarding his grand jury testimony in defendant's case:

> "Q. *** The state's attorney asked, 'Did you see a man who turned out to be
> Michael Suggs standing outside a church at that location?' And your answer was, 'Yes.'
> Did you testify to that?
>
> A. Yes.

Q. Okay, and did you testify that: 'Question: Did you see another man hand Michael Suggs a handgun?'

A. Yes.

Q. And you answered yes, is that correct?

A. Yes.

Q. And then did you testify, 'Did you see Michael Suggs get into a silver Grand Prix after he received the handgun, and that that silver Grand Prix then drive away?'

A. Yes.

Q. So at the grand jury you testified Mr. Suggs was outside of the car when the transmission of the gun was made, correct?

A. Yes."

¶ 15    On cross-examination, the State confirmed with Turner that his trial testimony had been that defendant was inside the Grand Prix when the man on the sidewalk handed him a handgun through the car's window. When the State asked Turner to explain the difference between his grand jury testimony and trial testimony regarding defendant's location at the time he received the handgun from the man on the sidewalk, Turner stated he did not hear the Assistant State's Attorney (ASA) say the word "after" in the question posed to him during his grand jury testimony—"Did you see Michael Suggs get into a silver Grand Prix after he received the handgun." Turner also stated that throughout his grand jury testimony, he was asked questions and "gave answers that were just yes answers." Turner testified that he clearly recalled defendant being inside the Grand Prix at the time he received the handgun. On redirect by defense counsel, Turner agreed that during his grand jury testimony, he either misunderstood the question posed by the ASA or did not hear

it correctly. On re-cross, Turner indicated that the first time he had a chance to see the transcript of his grand jury testimony was when he came to court to testify.

¶ 16    Darrin Nelson testified for the defense that he was driving the Grand Prix and pulled over when he noticed a police car with its lights on pass and barricade him. He denied trying to flee or elude the police. Nelson acknowledged that the police found a handgun under the passenger seat of the Grand Prix, but denied knowing it was in the car or to whom it belonged. He stated that the police said they would charge him with possessing the handgun because he was driving the car. However, he was only charged with fleeing and eluding the police. On cross-examination, Nelson testified that he did not recall a man standing on the sidewalk talking to defendant before they drove away from the funeral.

¶ 17    The case was continued to October 24, 2016. On that date, Edmond did not appear in court. After noting Edmond's absence, the trial court stated, "My assumption is that since he has not appeared in effect he's exerting his 5th Amendment rights."

¶ 18    The defense called Chicago police sergeant Dennis O'Brien, who testified that he assisted in curbing the Grand Prix, as he had received a radio transmission from another officer that there was a handgun in the car. When asked whether anyone had admitted to possessing the handgun, O'Brien answered, "It's—someone began to, as my report reflects, the fact that they did possess it, and then immediately retracted it upon making an admission." O'Brien stated that the police "sought charges against Mr. Edmond" because he was a convicted felon in the vicinity of a firearm, but "they were declined by the State." O'Brien also stated that at the time the Grand Prix was stopped, he did not know which of its three occupants possessed the handgun. However, while still on the scene, he "eventually" learned it was defendant.

¶ 19     On cross-examination, O'Brien confirmed that at the time of the stop, he was in radio communication with Turner about the nature of the stop and was providing the information from Turner to other officers at the scene. The State asked O'Brien the following questions:

"Q. Specifically did Officer Turner indicate to you what he had seen regarding that stop or that vehicle prior to him putting out the radio call?

A. Yes, he did.

Q. And did he indicate to you that he had seen the front passenger of that vehicle Mr. Suggs retrieve through the window of that car while he was seated in the car a handgun from someone who had been standing outside the car?

A. Yes, he did."

O'Brien testified that he related Turner's information to Whigham, who then looked in the Grand Prix and observed a handgun underneath the front passenger seat, where defendant had been seated.

¶ 20     Defendant testified that after the funeral, he, Nelson, and Edmond got into Nelson's car. Defendant did not have a conversation with anyone other than Nelson and Edmond, and no one handed him anything at the car's window. At some point, the police pulled Nelson over, searched the car, and said they found a handgun. Defendant did not see the recovered handgun, denied owning or possessing a handgun, and denied being aware that there was a handgun in the car.

¶ 21     In rebuttal, for purposes of impeachment, the State submitted certified copies of defendant's prior convictions for AUUW and unlawful possession of a firearm by a gang member on December 14, 2015, and unlawful possession of a firearm by a gang member on March 25, 2016.

¶ 22    In closing arguments, defense counsel, among other things, noted that Turner testified inconsistently at trial and in his grand jury testimony regarding whether defendant was standing outside the car or sitting inside the car when the handgun was handed to him. Counsel acknowledged Turner's explanation that he did not hear the ASA's question correctly, but asserted that Turner was a "professional witness" and could have stopped the grand jury proceedings to ask for clarification. Counsel argued that the inconsistency called into question Turner's credibility and his "entire line of testimony."

¶ 23    In response, the State addressed the issue of when the handgun was tendered to defendant "specifically as it goes to the credibility of Officer Turner," as "[t]he only purpose of bringing up the Grand Jury is strictly to impeach Officer Turner." The State submitted that Turner was credible because it was not until he saw the transcript of his grand jury testimony that he noticed the ASA's misstatement of the facts. As such, according to the State, Turner had no obligation to stop the grand jury proceedings. The State argued that other than the error of the ASA at the grand jury proceedings, there was no other impeachment of Turner whatsoever.

¶ 24    The trial court found defendant guilty on all counts. In the course of announcing its judgment, the trial court reviewed Turner's trial testimony, including that Turner saw an "unknown person hand[ ] the defendant an unknown object through the front window; dark object, that turned out to be a handgun. Based upon his past experience, he recognized the handle." The court noted the defense had also called Turner as a witness and elicited that in his grand jury testimony, Turner agreed that defendant got into the car after he received the handgun. In reviewing O'Brien's testimony, the court noted O'Brien had received a radio transmission regarding the presence of a handgun in the car. The court stated, "He said that the person in the front passenger seat retrieved

the gun from the person outside and then the person outside gave that gun to the person who turned out to be the defendant inside the car at the time."

¶ 25    Regarding Turner's credibility, the court stated as follows:

"While the Grand Jury testimony of Officer Turner in terms of the question of whether the defendant was inside or outside of the car would appear to be impeaching, the State's suggestion which is certainly borne out by the answers that Officer Turner was giving yes to whatever questions were being asked, but additionally there is no indication that he had written a police report to the contrary and in fact, Sgt. O'Brien's testimony was that the information had been related on the date of the incident where the defendant was inside at the time.

\* \* \*

Officer Turner testified again based on his being assigned in a covert capacity to observe the funeral, they would have been extra alert to see if anything could possibly arise as a result of a funeral necessitated by a homicide when he observed the transfer of the gun. I believe his testimony is that and I would accept his testimony that it took place while the defendant was inside. The defendant was the one who retrieved the gun from the unknown individual."

¶ 26    Defendant did not file a posttrial motion. On November 28, 2016, the trial court imposed a sentence of nine years and six months in prison for UUWF (count I). Defendant did not file a motion to reconsider sentence. On May 4, 2017, defendant filed a late notice of appeal which this court granted.

¶ 27    On appeal, defendant contends that his trial counsel was ineffective for failing to object on hearsay grounds to O'Brien's testimony regarding what Turner told him. Defendant argues that the credibility of Turner, who testified at trial that defendant was seated in the Grand Prix when a man handed him a handgun through the car's window, was key to the State's case because he was the only witness to place defendant in actual possession of the handgun, and that Turner's credibility was impeached with his grand jury testimony that he saw defendant enter the Grand Prix "after" receiving the handgun. Defendant asserts that the State improperly bolstered Turner's credibility through O'Brien's testimony that Turner said he saw defendant receive the handgun through the Grand Prix's window. According to defendant, this was inadmissible hearsay and there was no strategic reason for defense counsel not to object to it. Defendant maintains that he was prejudiced by counsel's failure because Turner's credibility was critical to the State's case for actual possession and because the trial court relied, in part, on the hearsay testimony in finding him guilty.

¶ 28    The State responds that any objection made by defense counsel would have been futile, as O'Brien's testimony was admissible to show the officers' course of conduct and to rehabilitate Turner where the defense made an express or implied suggestion that he had a motive to lie or that his trial testimony was a recent fabrication. The State also argues that defendant was not prejudiced because the outcome of the trial would have been the same without O'Brien's testimony.

¶ 29    To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In addition, a defendant must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* If a claim may be determined on the basis that there is no prejudice, it is not necessary for a reviewing court to consider whether counsel's performance was deficient. See *id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice *** that course should be followed.")

¶ 30 Here, we need not determine whether Turner's statement to O'Brien showed the officers' course of conduct, whether it was elicited to respond to express or implied suggestions that Turner's trial testimony was a recent fabrication, or whether defense counsel's failure to object to O'Brien's testimony was unreasonable. This is because defendant cannot establish prejudice as a result of counsel's failure to object to O'Brien's testimony. See *id.*; *People v. White*, 2011 IL 109689, ¶ 133. Even without the challenged testimony, the evidence against defendant was more than sufficient to convict. See *People v. Weston*, 2011 IL App (1st) 092432, ¶ 38.

¶ 31 Turner testified at trial that he saw defendant, who was seated in the front seat of the Grand Prix, receive a handgun through the car window from a man on the sidewalk. When confronted with his grand jury testimony, Turner acknowledged that he answered affirmatively when he was asked, "Did you see Michael Suggs get into a silver Grand Prix after he received the handgun, and that that silver Grand Prix then drive away?" Turner explained that his trial testimony and grand jury testimony differed because he did not hear the ASA say the word "after" in the question posed to him during his grand jury testimony and he did not see the transcript of his grand jury testimony until he came to court to testify. He also agreed that during the grand jury proceedings, he just answered "yes" to questions posed by the ASA. Turner then reiterated that he clearly recalled defendant being inside the Grand Prix at the time he received the handgun. Further evidence

presented at trial showed that the police pursued the Grand Prix as it drove away and that when it was curbed, a handgun was recovered from underneath the seat where defendant had been sitting. Having carefully reviewed all the evidence presented at trial, we find that the evidence of defendant's guilt—even absent Turner's statement to O'Brien—was overwhelming. See *Weston*, 2011 IL App (1st) 092432, ¶¶ 38, 42 (evidence may be deemed overwhelming even in the absence of physical evidence or a confession or where a defendant questions the credibility of witnesses).

¶ 32     A defendant claiming ineffective assistance of counsel based on his trial counsel's failure to object to hearsay testimony cannot establish the prejudice prong of the *Strickland* test if the admissible evidence against the defendant is overwhelming or the inadmissible hearsay evidence is cumulative of admissible evidence. See, *e.g.*, *People v. Theis*, 2011 IL App (2d) 091080, ¶¶ 41, 44; *People v. Alexander*, 354 Ill. App. 3d 832, 846-47 (2004); see also *People v. Torres*, 18 Ill. App. 3d 921, 929 (1974) ("Even if hearsay testimony is improperly admitted, reversal is not warranted where the same matter has been proved by properly admitted evidence."). Here, where overwhelming admissible evidence established that defendant possessed a firearm, and where Turner's statement to O'Brien was cumulative of Turner's trial testimony, we cannot find that defendant was prejudiced by his trial counsel's failure to object to O'Brien's testimony on hearsay grounds.

¶ 33     In reaching this conclusion, we are mindful of defendant's argument that he demonstrated prejudice where the trial court relied, in part, on the hearsay testimony in finding defendant guilty. In support, defendant cites the portion of the trial court's ruling where it addressed Turner's grand jury testimony. There, the court observed that the grand jury testimony "would appear to be impeaching," but then rejected that conclusion based on three circumstances. First, the court

accepted Turner's explanation that he had simply been saying "yes" to whatever questions were being asked during the grand jury proceedings. Second, there was no indication that Turner had written a police report to the contrary. Third, the court stated, "O'Brien's testimony was that the information had been related on the date of the incident where the defendant was inside at the time."

¶ 34    While the trial court did reference O'Brien's testimony, it was only as the third of a list of reasons given for not finding Turner's grand jury testimony to be impeaching. Even if the court had not mentioned O'Brien in this portion of its ruling, it still would have had two sound reasons for finding Turner's credibility had not been fatally impeached. In our view, it was reasonable for the trial court to accept Turner's explanation as to why his trial and grand jury testimonies differed regarding defendant's exact location at the time he received the handgun from the man on the sidewalk. See *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006) ("The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact.").

¶ 35    In sum, defendant has not demonstrated prejudice where the evidence, even absent O'Brien's testimony, sufficiently supported the finding of guilt. Accordingly, we cannot find that counsel's failure to object to the testimony had any effect on the outcome of the trial. Stated differently, defendant has not shown that absent O'Brien's testimony, a reasonable probability exists that the trial court would have acquitted him because of the inconsistency between Turner's trial and grand jury testimonies. See *People v. Martin*, 408 Ill. App. 3d 44, 52 (2011) ("Because [defendant] has not established a reasonable probability that he would have achieved a better result

if defense counsel had not erred, [defendant] has not shown that he received ineffective assistance of counsel."). Therefore, defendant's claim of ineffectiveness fails.

¶ 36    For the reasons explained above, we affirm the judgment of the trial court.

¶ 37    Affirmed.