2016 IL App (1st) 130071

Nos. 1-13-0071 & 1-13-0715

Fourth Division

Opinion filed October 29, 2015

Modified upon allowance of rehearing May 5, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
|     Plaintiff-Appellee, | ) | |
| | ) | No. 09 CR 14267 |
|     v. | ) | |
| | ) | The Honorable |
| DANYALE MOODY, | ) | Mary Margaret Brosnahan, |
|     Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.

Justices Howse and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant Danyale Moody was convicted of first degree murder pursuant to section 9-1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-1(a)(1) (West 2008)) and aggravated kidnapping pursuant to section 10-2(a)(3) of the Code (720 ILCS 5/10-2(a)(3) (West 2008)), and sentenced to consecutive terms of 60 years and 25 years in prison. On appeal, defendant contends that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred when it denied his pretrial motion to dismiss the first degree murder charges; (3) the State failed to prove that Illinois had jurisdiction over the murder charges beyond a reasonable

doubt; (4) he was denied his right to due process where the jury was not instructed that jurisdiction was an essential element of the offense of first degree murder that must be proven beyond a reasonable doubt; (5) the trial court erred in issuing a jury instruction on causation in homicide cases, where it was not an issue at trial; (6) the State committed misconduct in closing argument when it erroneously tried to define the reasonable doubt standard for the jury, misstated the law regarding the presumption of innocence, impermissibly shifted the burden of proof to defendant, and misstated the facts regarding defendant's identification; (7) trial counsel was ineffective for failing to request separate verdict forms supporting the three different forms of first degree murder; and (8) the fines, fees, and costs should be reduced. For the reasons that follow, we reverse defendant's first degree murder conviction and modify the mittimus to reflect a $660 assessment balance.[1]

¶ 2    In December 2007, defendant and codefendant, Anthony McGee[2] were formally charged with aggravated kidnapping, aggravated battery, aggravated unlawful restraint, and attempted murder of Frentsi Bridges. Defendant asserted his rights under the Speedy Trial Act (725 ILCS 5/103-5 (West 2008)), demanding trial on December 15, 2007. On August 7, 2009, the State brought a new indictment against defendant and codefendant, charging the men with all three forms of first degree murder (felony, intentional, and strong probability) and aggravated kidnapping of Bridges. The State nol-prossed the original indictment and proceeded to trial on the new indictment. Defendant and codefendant were separately represented, but tried jointly before the same jury.

---

[1] We originally reversed the trial court's decision and remanded for resentencing in an opinion filed on October 29, 2015; however, we subsequently granted defendant's petition for rehearing.

[2] Codefendant is not party to this appeal, however we note that he has an appeal under case number 1-13-0367, which is related to this case.

¶ 3    Prior to trial, defendant filed a motion to dismiss the counts of first degree murder on speedy trial grounds. In his motion, defendant detailed that he had spent nearly 18 months in custody preparing for trial on the original charges before the State decided to charge him with first degree murder. Defendant argued that because the State was aware of all the relevant facts alleged in the subsequent indictment at the time of the original indictment, and because all of the offenses were within the jurisdiction of the criminal court of Cook County, the State was required to join the offenses in a single prosecution pursuant to section 3-3 of the Code. 720 ILCS 5/3-3 (West 2008). Defendant further argued that because the State was required to join the charges, but did not, the time within which the trial was to begin on the murder charges was subject to the same statutory speedy trial period as applied to the original charges. As none of the continuances obtained in connection to the original charges could be attributed to defendant with respect to the subsequent murder charges, because they were not before the court when the continuances were obtained, the State violated his right to a speedy trial with respect to the murder charges. The State responded that it was not required to join the murder charges in the original indictment because the jurisdiction over the murder of Bridges lay within the jurisdiction of more than one court. The court denied defendant's motion to dismiss. The following facts were adduced at trial.

¶ 4    Mark Cohill, fire investigator for the Indiana fire department, testified that on May 14, 2007, around 12:37 p.m., Bridges' body was discovered in an abandoned garage at 2274 Adams Street in Gary, Indiana after fire fighters extinguished a fire that had been set to the garage. He examined the exterior of the abandoned brick garage. Cohill noted that fire could not have been started by electricity or gas because there were no utilities hooked up to the building. He examined the interior of the structure and observed a body under a chair. Cohill did not know how long the body had been in the structure prior to the fire. The concrete floor under the body

had spalling which was caused by extreme heat and acceleration from an accelerant such as an ignitable liquid like gasoline. Cohill also observed heavy charring on the ceiling and noted that the flames near the area of the chair and body had been very hot. The water used to extinguish the fire was discolored with a rainbow pattern which demonstrated that an ignitable liquid was used. Cohill concluded that the fire was set intentionally.

¶ 5     Dr. Young Kim, an Indiana medical examiner and expert in the field of forensic pathology, performed an autopsy on Bridges in May 2007. An external examination revealed five lacerations on the right side of the back of the head, one laceration on the left side of the back of the head, and a depressed fracture at the back of the skull. Dr. Kim retracted Bridges' scalp and observed a subdural hemorrhage, a subarachnoid hemorrhage, and a subgaleal hemorrhage. He also observed hemorrhaging in the jaw area and the right chest, a laceration of the lip, and three broken teeth. He opined that based on the extensive burns to the face and body, Bridges' was face down and not moving when the fire began. Upon internal examination, Dr. Kim found soot in Bridges' mouth and scant soot in his distal bronchi. He opined that when the body was dropped face down in the garage in Indiana, the pressure from falling could have caused the soot to be deposited in the mouth and the lungs. His coroner's verdict report indicated that the cause of death was "extensive craniocerebral injuries associated with facial and thoracic injuries related to blunt force trauma" and "extensive burns and charred body."

¶ 6     At trial, Dr. Kim testified on direct examination that he could not be certain whether Bridges was dead or alive when the fire started. He noted that the absence of carbon monoxide in Bridges' body indicated that he was not alive when the fire started; however, he also noted that Bridges' lungs contained fluid which could have been caused by smoke inhalation, indicating that he was alive when the fire started. However, he stated that the cause of death was "extensive head injuries, also facial and chest injuries due to blunt forced [*sic*] trauma." On cross-

examination, defendant's attorney asked Dr. Kim if he recalled having a conversation with her and a colleague in August or September of 2009, where he opined that defendant was already deceased at the time of the fire. Dr. Kim responded that he recalled the conversation, but stated that his final opinion regarding the cause of death never changed from his initial autopsy report and indicated that the cause of death was "blunt force trauma and extensive burn, together." He also indicated that Bridges' wounds were fresh, occurring within two to three hours of his death and were likely caused by being hit with a blunt object such as a board.

¶ 7     Mariah Price testified that in May 2007 she was dating Bridges. One week before Bridges was kidnapped, she was with him and a man named George. Price, Bridges, and George went to a house and Bridges told Price and George to wait on the corner. Bridges walked through a side gate and down the gangway to the side of the house.[3] Later, Price noticed that Bridges had marijuana that she had not seen him with prior to entering the house. She spent the night of May 13, 2007, with Bridges at the home of a woman named Seka. Bridges introduced Seka as his sister. The next morning, around 10 a.m., Price and Bridges were picked up in a Grand Prix by two men that Bridges knew, but she did not know. They drove to the dollar store at 111th Street and Michigan Avenue. Price remained in the car while the front seat passenger and Bridges went into the store. When Bridges came out of the store, Price observed him speaking with a man with a green hat. The man in the green hat then punched Bridges in the face. When Bridges tried to escape, a shorter man in a white T-shirt came up and tried to grab Bridges and punched him in the ribs. The man in the green hat picked up Bridges and walked him toward a van that was around the corner, and the van pulled away. Price testified that neither she nor the men in the Grand Prix got out of the car. The men took Price back to Seka's house. Price told Seka what

---

[3] The house was later identified at trial as the home of a woman named Latoya, defendant's girlfriend.

happened. Seka's mother, who Bridges had introduced as also being his mother, told Price not to call police. Price gave Seka a phone that Bridges had left in the backseat of the Grand Prix.

¶ 8       The next day, Price learned that Seka's mother was not Bridges' mother. Price then called Bridges' mother, Keena Thompson. A few days later, the police contacted Price; she gave a statement to the police regarding the kidnapping, and she described the two people she saw take Bridges. Price also accompanied a detective to the scene where Bridges was taken and showed him where the car she was in was located and where the van was during the incident. In September 2007, Price viewed a lineup and identified codefendant as the shorter man in the white T-shirt who had run up and punched Bridges. She never identified the man wearing the green hat because she was not able to see his face clearly. Price identified a surveillance video from outside the dollar store as depicting what she saw had happened to Bridges on May 14, 2007. The video was also played for the jury.

¶ 9       Leonardo Johnson testified that he lived in a home at 36 West 112th Street with his mother, sisters, and codefendant. Codefendant was the father of his sister's baby. The State elicited testimony that Johnson had a 2012 conviction for felony delivery of cannabis, and at the time of his testimony he had a pending drug case. Johnson had met defendant, who he knew as "Little G," through codefendant. On May 9, 2007, codefendant asked Johnson if he knew Bridges, and Johnson said that he did. He told Johnson that Bridges had stolen some marijuana and an Ipod from Latoya's house. Latoya was defendant's girlfriend. Johnson told codefendant that Bridges had asked him if he wanted to steal some marijuana from defendant, and Johnson told him no.

¶ 10      On May 14, 2007, around 10 a.m., codefendant awakened Johnson by shouting up to his bedroom from the front yard and told him to come down and take a ride with him. Codefendant was driving a van, and drove Johnson to Latoya's house on 114th Place. They entered the

building and went to the basement, where defendant and Bridges were located. Codefendant was wearing a white shirt and blue pants, and defendant was wearing a white shirt, blue pants, and a green cap. Bridges was on his back, on the ground, and his hands and feet were tied. Defendant was standing over Bridges and repeatedly hitting him in the mouth with a two-by-four board. Bridges was crying and pleading with defendant. Bridges' mouth was bleeding and his teeth were coming out. Codefendant went up the internal stairs and returned with a silver eating utensil wrapped in a towel. He stuck the utensil on the left side of Bridges' chest and Bridges yelled that it was hot. Bridges said he would give back the marijuana, the money he got from selling some of the marijuana, and some guns if they would let him go. Defendant responded, "we supposed to be homies *** how you my homey [*sic*] and you stealing my [stuff]." Bridges asked for water, and defendant and codefendant sprayed Bridges with hot water from a hose hooked up to the laundry tub. Codefendant untied Bridges, turned him on his stomach, and tied his arms to a pole. He then placed a bag of dry concrete on Bridges' neck. Johnson told codefendant that he was ready to leave and codefendant drove him home. Bridges was alive when Johnson left. Johnson never saw Bridges again, nor did he speak to codefendant about what he had seen. He did not call the police because he was afraid of defendant and codefendant.

¶ 11    On July 8, 2007, Johnson and codefendant got into an argument at home about cleaning the house. Codefendant told Johnson that "y'all little niggers already know how we get down. We some beasts.  Y'all already know what we do." Johnson thought the comment was referring to Bridges and he felt threatened. The police arrived at the house during the argument. Johnson told one of the officers that he knew about a kidnapping, and the officer took Johnson to the station. A detective then showed Johnson a surveillance video obtained from the dollar store at 11136 South Michigan Avenue. Johnson identified Bridges, codefendant, and a person he knew as Little G in the video. On September 9, 2007, Johnson gave a handwritten statement to the police

and an assistant State's Attorney. He also identified a photo of defendant as a photo of Little G and identified the van codefendant had used to drive him to Latoya's house. Initially, Johnson told police that he had never seen the van codefendant used to drive him to Latoya's house. However, he later revealed that he had occasionally rented the van from a guy named "Mike the Crackhead" in exchange for crack. He stated that he had lied because he did not want to tell the police that he had given someone crack to rent the van. He identified defendant in court as the person he knew as Little G.

¶ 12     Lezly Reeves testified that in May 2007 she owned a two-flat building at 116 West 114th Place. Reeves rented the first floor apartment to Latoya. On May 14, 2007, Reeves and her brother, Tyson Jackson, went to the building to fix a window that Latoya had reported broken when someone broke into her apartment. They drove to the back of the building where Reeves observed a light blue minivan in the backyard and several men in the backyard and on the back porch. As she approached the back porch, Reeves observed Latoya's boyfriend, later identified as defendant, walk to the side of the building, "chirp" on his phone, and state that the landlord was there. Reeves and Jackson went into the enclosed back porch and Jackson began fixing the broken window. Reeves then heard someone say help me from inside the building. She also heard some tussling coming from the front of the apartment. Reeves saw Latoya's cousin, later identified as codefendant, walking from the front of the first floor apartment toward the rear. The man was breathing heavily and appeared to have blood on his hand. Reeves asked him about the sound and he claimed that he had been wrestling with the second floor tenant's grandson. Reeves did not believe him, and she walked through the apartment to the front living room to see what was happening. When she got there, she observed Latoya's boyfriend "straddling" a man who was on the floor on his back. The man's face was covered with a T-shirt and he did not have on a shirt. He was bleeding from his torso area. Latoya's boyfriend told her that the man had broken

into Latoya's apartment and taken some electronics. He also told her that he had called the boy's mother to come and pick him up.

¶ 13    When Latoya arrived Reeves met her on the sidewalk in front of the building to talk to her about what was happening. She told Latoya, who had been living in the apartment for less than a year, that she needed to move out. Reeves went back inside the building and noticed that everyone had left. She also noticed that the blue van was gone. Reeves and Jackson left the building and went directly to the police station at 111th Street and reported the incident. The police told Reeves that if she did not know the names of any of the people involved, they could not do anything. Reeves later called the FBI and told them what she had seen. On July 13, 2007, the police showed Reeves a photo array consisting of six photos. Reeves identified a photo of co-defendant as Latoya's cousin. She did not identify defendant in the photo array. Reeves viewed a lineup in September 2007, and again identified codefendant. She viewed a second lineup in December 2007 and indicated that one of the participants closely resembled Latoya's boyfriend, but she couldn't be sure because the perpetrator was wearing a hat and had facial hair at the time. She made an in-court identification of defendant as Latoya's boyfriend and codefendant as Latoya's cousin.

¶ 14    Detective Fassl testified that on July 8, 2007, he spoke with Johnson about Bridges' kidnapping. Detective Fassl showed Johnson some photographs and Johnson identified co-defendant. Detective Fassl also showed Johnson the video surveillance taken outside the dollar store at 11136 S. Michigan Avenue, and Johnson identified Little G, codefendant, and Bridges. On September 9, 2007, Detective Fassl and assistant State's Attorney Susan Jakubiak met with Johnson and Johnson signed a prepared statement detailing his knowledge of the kidnapping. On that date, Johnson identified a photograph of defendant as the man he knew as Little G. Defendant was arrested on December 12, 2007. Detective Fassl also interviewed Reeves about

the incident she witnessed in her building. On July 13, 2007, Detective Fassl received Reeves' permission to search her basement. Upon entering the basement, he noted that it was partially flooded. Detective Fassl saw a two-by-four against a wall which appeared to have blood stains and teeth imprints on it, a large bag of concrete, and a kitchen spoon. He contacted the crime lab to process the scene.

¶ 15    Donald Fanelli, a former forensic investigator with the Chicago police department, processed the basement. He photographed the exterior of the building and the interior of the basement. Fanelli collected and inventoried a spoon, a two-by-four that had possible blood on it, a bag of concrete, a sample of what appeared to be blood on a wall in the basement, and a sample of what appeared to be blood spatter on one of the two furnaces in the basement. He noted that the spoon was discolored, indicating that it has been subjected to heat.

¶ 16    The parties stipulated that the DNA from the blood stains found on the two-by-four and the furnace matched the DNA of Bridges. No fingerprints could be recovered from the two-by-four. The court admitted the State's exhibits into evidence and the State rested.

¶ 17    The court heard and denied defendant's motion for a directed verdict. Defendant waived his right to testify, asked the court to admit into evidence a photo array without witness identification marks, and rested without presenting further evidence.

¶ 18    Following closing arguments, the jury found defendant guilty of aggravated kidnapping and murder. The court subsequently denied defendant's motion for a new trial. After a sentencing hearing, the court sentenced defendant to 60 years in prison for murder and 25 years in prison for kidnapping to run consecutively. Defendant's motion to reconsider his sentence was denied.

¶ 19                                ANALYSIS

¶ 20                              Motion to Dismiss

¶ 21    First, defendant contends that the trial court erred when it denied his motion to dismiss, claiming that the State violated the Speedy Trial Act by charging defendant with first-degree murder 18 months after the initial indictment. The State responds that the trial court properly denied defendant's motion to dismiss the indictment where it was not required to join the murder charges at the time the original charges were brought because the State was not aware that the acts that caused the victim's death occurred in Illinois and the murder fell within the jurisdiction of more than one court. We agree with defendant, and reverse his conviction for first degree murder.

¶ 22    We note that because we reverse defendant's conviction for the first degree murder charge on this issue, we need not address defendant's contention regarding whether the State proved jurisdiction over the murder charges beyond a reasonable doubt and whether the jury was properly instructed that jurisdiction was an essential element of the offense of first degree murder. Additionally, because the causation instruction regarding murder was not related to defendant's aggravated kidnapping conviction, we need not address defendant's contention that the trial court erred when it tendered a jury instruction on causation in homicide cases.

¶ 23    Initially, the State maintains that this issue should be stricken from the brief because defendant failed to provide a sufficient record of the hearing on his motion to dismiss. Even where the record on appeal is incomplete, the reviewing court may still consider the merits of a party's argument where the record contains sufficient information necessary to dispose of the issues presented in the appeal. *Luss v. Village of Forest Park*, 377 Ill. App. 3d 318, 331 (2007); see also *Gonnella Baking Co. v. Clara's Pasta di Casa, Ltd.*, 337 Ill. App. 3d 385, 388 (2003) (reviewing the trial court's ruling on a motion to dismiss in absence of a transcript of the hearing on the motion, reasoning that the pleadings and supporting documents in the record were sufficient for reviewing the court's decision on *de novo* review). We find the absence of a report

of proceedings, certified bystander's report, or agreed statement of facts does not preclude our review of defendant's claimed error as the record sufficiently contains defendant's motion to dismiss and the parties' pleadings in support of and in opposition to the motion presented to the trial court to allow this court to dispose of the issues.

¶ 24    Criminal defendants possess both constitutional (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8) and statutory (725 ILCS 5/103-5 (West 2008)) rights to a speedy trial. While these provisions address similar concerns, the statutory right and the constitutional right are not coextensive. *People v. Woodrum*, 223 Ill. 2d 286, 298 (2006); *People v. Gooden*, 189 Ill. 2d 209, 216-17 (2000). Whether a defendant's statutory right to a speedy trial has been violated is a question of law reviewed *de novo*. *People v. Van Schoyck*, 232 Ill. 2d 330, 335 (2009).  In the case at bar, defendant asserted solely a violation of his statutory right to a speedy trial and did not raise a constitutional issue.

¶ 25    Under the speedy-trial statute, every person charged with an offense shall be tried within either 120 or 160 days, depending on his custodial status, unless delay is occasioned by the accused. 725 ILCS 5/103-5 (West 2008). A defendant not tried within the statutory period must be released from his trial obligations and have the charges dismissed. 725 ILCS 5/103-5(d), 114-1(a)(1) (West 2008). Where a defendant is charged at different times with multiple factually related offenses, as in the instant case, the speedy-trial guarantee is tempered by compulsory joinder principles. *People v. Williams*, 204 Ill. 2d 191, 198 (2003).

¶ 26    The compulsory joinder provision of the Code provides in relevant part:

"(a) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense.

(b) If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must

be prosecuted in a single prosecution *** if they are based on the same act." 720 ILCS 5/3-3 (West 2008).

¶ 27    Thus, under the compulsory joinder rule, multiple charges against a defendant must be joined in a single prosecution if the following three conditions are satisfied: (1) the multiple charges are known to the prosecutor when the prosecution begins; (2) the charges are within the jurisdiction of a single court; and (3) the charges are based upon the same act. *People v. Kazenko*, 2012 IL App (3d) 110529, ¶ 12. Whether charges are subject to compulsory joinder is an issue of law and thus subject to *de novo* review when, as here, none of the relevant facts are in dispute. See, *e.g.*, *People v. Hunter*, 2012 IL App (1st) 092681, ¶ 2 (using *de novo* review in similar circumstances). Here, the parties do not dispute that the charges were based upon the same act. However, the parties disagree on whether the State had the requisite knowledge that the acts that caused Bridges' death occurred in Illinois at the time of the first indictment and whether the murder charges fell within the jurisdiction of a single court.

¶ 28    The State contends that "additional information" came to light in the form of a conversation with Dr. Kim in August or September 2009 which revealed that Bridges was already dead at the time that the fire was started and triggered its decision to finally charge defendant with first degree murder. Our review of the record reveals that the "additional information" about which the State refers comes from the trial cross-examination of Dr. Kim by defendant's attorney.  On cross-examination, defense counsel questioned Dr. Kim regarding a prior conversation with her in which he rendered an opinion that Bridges may have been dead before the fire started. There is no indication from the record that the State knew that this conversation had taken place prior to trial.  Clearly, Dr. Kim's testimony at trial could not possibly have prompted the State's pretrial decision to charge defendant with murder.  Even so,

our review of the record supports the conclusion that the State had ample knowledge to charge defendant with first degree murder in December 2007, when the initial indictment was filed.

¶ 29    In *People v. Luciano*, 2013 IL App (2d) 110792, ¶ 78, this court defined "knowledge" in context of section 3-3 as "the conscious awareness of evidence that is sufficient to give the State a reasonable chance to secure a conviction." Here, in Dr. Kim's coroner's verdict report, dated August 14, 2007, he indicated that Bridges' cause of death was "extensive craniocerebral injuries associated with facial and thoracic injuries related to blunt force trauma" and "extensive burns and charred body." At trial, he testified that his opinion regarding Bridges' cause of death never changed from his initial autopsy report. In her initial statement to police, Price stated that two men had kidnapped Bridges from a dollar store located in Chicago on the morning of May 14, 2007. In Johnson's initial statements to police, he stated that he observed defendant and co-defendant violently and repeatedly torture and beat Bridges in the mouth with a two-by-four in a Chicago basement located just blocks away from where Bridges was kidnapped. A few hours later, Bridges' was found dead in Gary, Indiana, approximately 25 minutes from where he was kidnapped. Thus, although the State points out that when a victim is not found in Illinois, it is presumed that a state other than Illinois has jurisdiction over the murder case (720 ILCS 5/1-5(b) (West 2008)); this presumption was rebutted here because the State had knowledge that at least part of the injuries that caused Bridges' death (*i.e.*, the blunt force trauma) occurred in Illinois. See 720 ILCS 5/1-5(a)(1) (West 2008) (Illinois has jurisdiction over a crime that occurred "wholly or partly within the State"); see also 720 ILCS 5/1-5(b) (West 2008) (An offense is committed partly in Illinois if either the conduct or a result that constitutes an element of the offense occurs within Illinois.).

¶ 30    Although not a compulsory joinder case, we find *People v. Alexander*, 354 Ill. App. 3d 832 (2004), instructive on this issue. In *Alexander*, a group of gang members, including the

defendant, severely beat the victim before driving him to a highway in Missouri, where he was ultimately struck by a vehicle and killed. *Id*. at 833. The defendant was charged under all three theories of murder, felony, intentional, and strong probability. The indictment alleged that the defendant committed the offense of first-degree murder in Illinois by beating the victim with " 'the intent to do great bodily harm to [him] *** *and then* left [the victim] [on a highway in] St. Charles County, Missouri, where he would be struck by vehicles, thereby causing the death of [the victim].' " (Emphasis in original.) *Id.* at 838. The defendant challenged whether the State could bring murder charges in Illinois where the injury that ultimately caused the victim's death took place in Missouri. *Id.* at 839. This court held that it was clear that the severe beating that the defendant sustained in Illinois was "a contributing cause of [the victim's] death," and therefore, Illinois could properly exercise jurisdiction over the murder charge although the victim was found and, presumptively died, in Missouri. *Id*. Similarly, in the instant case, although Bridges' body was found in Indiana, the 2007 coroner's verdict report coupled with the initial statements of Price and Johnson, indicates that the beating in Illinois was at least a contributing cause of the his death. This information was known to the State at the time of the initial indictment and nearly two years before its conversation with Dr. Kim. Thus, we reject the State's contention that it did not have sufficient knowledge to prosecute the crime because "it was not readily apparent that the murder occurred in Illinois." Rather, the evidence demonstrates a causal connection between Bridges' severe beating in Illinois and his death in Indiana and establishes that the murder occurred partly in Illinois.

¶ 31 Additionally, we note that the State's knowledge that the beating in Illinois was a contributing cause of Bridges' death could have supported a first degree murder charge under a felony, intentional, or strong probability theory. See 720 ILCS 5/1-5(a)(1) (West 2008); see also *People v. Pugh*, 261 Ill. App. 3d 75, 77 (1994) (holding that defendants are responsible for any

death precipitated by their initial criminal acts provided it was their criminal acts which set in motion the events which ultimately resulted in death). Accordingly, we find that at the time of the original indictment the State had a "conscious awareness of evidence that is sufficient to give the State a reasonable chance to secure a conviction." *Luciano*, 2013 IL App (2d) 110792, ¶ 78. Thus, we reject the State's contention that it did not have sufficient knowledge to charge defendant with murder in its initial indictment.

¶ 32    It is for this reason that we reject the State's reliance on *People v. Ursery*, 364 Ill. App. 3d 680 (2006). In *Ursery,* following the shooting death of the victim, the defendant was arrested and charged with aggravated discharge of a firearm and aggravated unlawful use of a weapon. *Id.* at 684-85. These charges were in part based on the defendant's statement admitting that he fired a gun at the victim in self-defense, but claiming that he fired only two shots, dropped the gun, ran away, and, while fleeing, heard more shots. *Id.* at 684. A witness testified that he had heard eight or nine rapidly fired shots without a pause after the first two shots. *Id.* at 681. The defendant was placed into the county jail, and about a month later, the defendant bragged to his cell mate, who happened to be a friend of the victim, that he had used gloves in the deliberate shooting of the victim, so he could not be tied to the crime. *Id.* at 685. About two months later, the State charged the defendant with murder, and following a trial, the defendant was convicted of murder. *Id.* The defendant appealed and argued that the State failed to timely institute the murder prosecution, violating the compulsory joinder requirements of section 3-3 of the Code.

¶ 33    The appellate court reasoned that, at the time the defendant was initially charged with the weapons offenses, the State only had enough evidence to suspect that the defendant intended to kill the victim and did not have enough evidence to "know" that the defendant intended to kill him. *Id.* at 690. Thus, the State was not required to join the murder charge to the weapons charges pursuant to the compulsory joinder provision. *Id*. It was not until the State learned that

the defendant had bragged about killing the victim and explained that he planned the offense so as not to leave any evidence, that the State had sufficient knowledge of the offense of murder for purposes of the compulsory joinder provision. *Id.* Accordingly, the murder charge was not prosecuted untimely or in violation of the defendant's speedy-trial rights.

¶ 34 In contrast, in the instant case, although the State argues that it charged defendant with first degree murder "upon learning that the murder occurred, wholly or partly, within Illinois," as detailed above, this information was already known to the State through the contents of the coroner's verdict report and the initial statements given to the police by Price and Johnson. Thus, unlike in *Ursery*, the State had tangible evidence that supported a first degree murder charge at the time of the initial indictment.

¶ 35 We next address whether the murder charges were "within the jurisdiction of a single court" for purpose of the compulsory joinder statute. The parties disagree on the meaning of the phrase. Defendant contends that the plain meaning of the phrase is simply that the same court must have jurisdiction over all of the offenses that would be joined under the statute. The State argues that the phrase was intended to limit compulsory joinder to cases where only one state has the power to decide the merits of the case. We find no case law on point to support either party's interpretation of the provision. Therefore, we begin our analysis by interpreting the statute.

¶ 36 The interpretation of a statute presents a question of law and is reviewed *de novo*. *People v. Marshall*, 242 Ill. 2d 285, 292 (2011). We begin our analysis with the following settled principles in mind. The fundamental objective of statutory construction is to ascertain and give effect to the intent of the legislature, presuming it did not intend to cause absurd, inconvenient, or unjust results. *People v. Lewis*, 234 Ill. 2d 32, 44 (2009) (citing *People v. Christopherson*, 231 Ill. 2d 449, 454 (2008)). "We give the language its plain and ordinary meaning [citation], and we read the statute as a whole and consider all relevant provisions together." *People v. Olsson*, 335

Ill. App. 3d 372, 374 (2002). We do not depart from the plain statutory language by reading into it exceptions, limitations, or conditions that conflict with the expressed intent. *People v. Evans*, 405 Ill. App. 3d 1005, 1008 (2010).We may also consider the consequences that would result from construing the statute one way or the other. *Marshall*, 242 Ill. 2d at 293. In giving effect to legislative intent, the court should consider, in addition to the statutory language, the reason for the law, the problems to be remedied, and the objects and purposes sought. *People v. Haywood*, 118 Ill. 2d 263, 271 (1987).

¶ 37    In this case, we believe that the plain meaning of "jurisdiction of a single court" does not preclude the State from bringing charges when another court also has jurisdiction over the alleged crime. Although the State argues that "multi-state criminal episodes" are excluded from the reach of the compulsory joinder statute, it does not present any support for this assertion. The plain language of the compulsory joinder provision requires that the State bring all charges that fall under its jurisdiction, and nothing in the statute indicates that the State is precluded from bringing all possible charges that it has jurisdiction over when another State also has jurisdiction over the charges.

¶ 38    Additionally, the State's interpretation of the provision is in direct conflict with the concept of dual sovereignty, which permits successive prosecutions by separate sovereigns. *Bartkus v. Illinois*, 359 U.S. 121, 135-36 (1959). That is, even if both Illinois and Indiana had jurisdiction over the murder charge, dual sovereignty allows for each state to prosecute the crime without regard to the other. See *Heath v. Alabama*, 474 U.S. 82, 93 (1985) ("The Constitution leaves in the possession of each State 'certain exclusive and very important portions of sovereign power.' [Citation.] Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code."). Thus, regardless of whether Indiana ever decided to pursue a murder charge against defendant, the State was required to join all known offenses, which included the

murder charges, at the time of the initial indictment pursuant to the mandate of the compulsory joinder statute. 720 ILCS 5/3-3 (West 2008).

¶ 39    Moreover, a consideration of the purpose of the compulsory joinder statute supports this conclusion. Our supreme court has held that the purpose of the compulsory joinder statute is "to prevent the prosecution of multiple offenses in a piecemeal fashion and to forestall, in effect, abuse of the prosecutorial process." *People v. Quigley*, 183 Ill. 2d 1, 7 (1998). A prosecutor might otherwise harass a defendant through successive prosecutions of multiple offenses and put a defendant through the expense of several trials until the prosecutor obtains a result that satisfies him. See *People v. Kennedy*, 161 Ill. App. 3d 197, 199 (1987). Further, our supreme court has found that delays in bringing more serious charges after an initial indictment hinders the defendant when preparing a defense and also presents defendant with a "Hobson's choice between a trial without adequate preparation and further pretrial detention to prepare for trial." *Williams*, 204 Ill. 2d at 207. Thus, all charges that could be brought within a single jurisdiction must be timely commenced in order to mitigate potential prosecutorial abuse.

¶ 40    Therefore, if we were to find that the murder charges were not subject to compulsory joinder in this case, defendant would be vulnerable to exactly the type of prosecution that the compulsory joinder statute seeks to prevent. Specifically, if the State were not required to join the first degree murder charges in its initial indictment and it did not secure a guilty verdict on the other charges, the State would still have the discretion to bring the murder charges in a subsequent proceeding. Additionally, defendant spent nearly 18 months in custody preparing for trial on the original charges before the State decided to charge him with first degree murder. Once defendant was alerted to the first degree murder charges, he spent another three years preparing to defend against the new charge. Clearly, the compulsory joinder statute was intended to prevent this exact scenario.

¶ 41    Because the murder charges arose from the same set of facts as the original charges, the State had knowledge of these facts at the beginning of the proceedings, and nothing prevented the State from exercising jurisdiction over the murder charges at that time, we find that the murder charges were subject to compulsory joinder. Thus, the time within which the trial was to begin on the new charges was subject to the same statutory limitations that were to be applied to the original charges. *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981). Further, although delay occasioned by the accused can toll the time for a speedy trial, this court has held that continuances obtained in connection with the trial of the original charges cannot be attributed to defendants with respect to new and additional charges when these new and additional charges were not before the court when those continuances were obtained. *Id.* at 249. Therefore, none of the continuances obtained by defendant in this case between his initial indictment and the new indictment can be attributable to him.

¶ 42    Thus, we find that the trial court erred when it denied defendant's motion to dismiss the first degree murder charge on speedy trial grounds. Having found that the State violated defendant's right to a speedy trial, we reverse his conviction for first degree murder. See 725 ILCS 5/103-5(d), 114-1(a)(1) (West 2008); see also *People v. Exson*, 384 Ill. App. 3d 794, 803 (2008) (noting that "[t]he only possible remedy for the deprivation of defendant's statutory right to a speedy trial is discharge.")

¶ 43                          Sufficiency of the Evidence

¶ 44    Second, defendant contends that he was not proven guilty beyond a reasonable doubt of aggravated kidnapping and murder where there was no physical evidence connecting him to the offense and where the identification testimony was insufficient. The State responds that the corroborated testimony of the three eyewitnesses established defendant's guilt beyond a

reasonable doubt. In light of our decision to reverse defendant's murder conviction, we review only whether the State's evidence supported a conviction for aggravated kidnapping.

¶ 45    Whether the State has presented sufficient evidence to sustain a conviction is reviewed by determining whether the evidence presented at trial, when viewed in the light most favorable to the State, would allow any rational trier of fact to find that the State had proved every element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the function of the trier of fact to determine the inferences to be drawn from the evidence, assess the credibility of the witnesses, decide the weight to be given their testimony, and resolve any evidentiary conflicts. *People v. Baugh*, 358 Ill. App. 3d 718, 736 (2005) (citing *People v. Tirado*, 254 Ill. App. 3d 497, 513 (1993)). "We will not substitute our judgment for that of the trier of fact on questions involving the weight to be assigned the evidence or the credibility of witnesses." *Id.* at 736-37 (citing *People v. Campbell*, 146 Ill. 2d 363, 375 (1992)). Further, we note that a criminal conviction will not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt. *People v. Maggette*, 195 Ill. 2d 336, 353 (2001).

¶ 46    We find that the testimonies of Price, Johnson, and Reeves were sufficient to establish defendant's guilt in this case.

¶ 47    Price testified that on May 14, 2007, around 10 a.m., she accompanied Bridges to the dollar store on 111th Street and Michigan Avenue, where she observed a man with a green hat and a shorter man punch Bridges. The man with the green hat picked Bridges up and walked toward the van. The  van then pulled away. Price identified codefendant as the shorter man involved in the kidnapping, but she never identified the man with the green hat because she was not able to see his face clearly.

¶ 48    Johnson testified that on May 14, 2007, around 10 a.m., codefendant picked him up in a van and drove him to Latoya's apartment on 116 West 114th Place. In the basement of the apartment, he witnessed defendant and codefendant torture and beat Bridges with a two-by-four board until his teeth were falling out of his mouth. He also observed codefendant place a hot utensil on Bridges' chest and a bag of dry concrete on his neck. When Bridges asked the men for water, both codefendant and defendant sprayed him with hot water from a hose hooked up to the laundry tub. Consistent with Price's testimony, Johnson stated that defendant was wearing a green cap. Johnson's eyewitness account was further corroborated by Detective Fassl, who testified that during his search of the basement on 114th Place, he noted it was partially flooded and he observed a two-by-four board against a wall which appeared to have blood stains and teeth imprints on it, a large bag of concrete, and a kitchen spoon. The parties stipulated that the blood matched Bridges'. Johnson initially identified defendant in the surveillance video taken outside of the dollar store. He again identified a photo of defendant while giving his handwritten statement. Johnson also made an in-court identification of defendant.

¶ 49    Reeves testified that on May 14, 2007, she and her brother went to the property that she owned on 114th Place. She rented the property to a woman named Latoya and she knew defendant as her boyfriend. As she approached the back of the building, she observed a van and several men in the backyard and on the back porch. As she walked to the back porch, she heard Latoya's boyfriend inform someone that the landlord was there. She also heard someone asking for help from inside the building. Once inside Latoya's apartment, she observed Latoya's boyfriend standing over a man who was on the floor on his back. The man's face was covered with a T-shirt and he did not have on a shirt. He was bleeding from his torso area. During a line-up, she indicated that one of the men closely resembled Latoya's boyfriend, but could not be sure

because the man she saw at Latoya's apartment was wearing a hat and had facial hair. However, Reeves made an in-court identification of defendant as Latoya's boyfriend.

¶ 50    Viewing the evidence in the light most favorable to the State, we do not find the evidence to be so improbable, unsatisfactory, or unconvincing as to raise a reasonable doubt of defendant's guilt. See *id*. A review of the evidence in this case indicates that the evidence was more than sufficient to sustain defendant's conviction for aggravated kidnapping.

¶ 51    Nonetheless, defendant contends that the evidence was insufficient to convict him because there was no physical evidence connecting him to the offense and Johnson had a motive to falsely accuse defendant, Reeves provided only a tentative identification, and Price failed to identify him as the second offender. Although defendant is correct that the State did not present physical evidence connecting defendant to the crime, we find that the testimonies at trial provided sufficient direct evidence of the events that took place on May 14, 2007, and were sufficient to support defendant's conviction for aggravated kidnapping.

¶ 52    First, Johnson consistently identified defendant as one of the two offenders that was involved in Bridges' kidnapping. Although defendant argues that Johnson lacked credibility because he had a motive to testify falsely, noting that Johnson did not immediately contact the police and was possibly involved in the offense, this is mere conjecture. Nothing in the record suggests that Johnson had a motive to or did in fact falsely testify. During his testimony, Johnson stated that he did not contact the police earlier because he was afraid of defendant and co-defendant. It was not until codefendant threatened him that he decided to contact the police as he feared for his safety. Defendant also argues that Johnson's testimony was undermined by his prior conviction for delivery of cannabis and a pending drug case; however, it is not the duty of the reviewing court to substitute our judgment for that of the trier of fact on questions involving the weight to be assigned the evidence or the credibility of witnesses. See *Baugh*, 358 Ill. App.

3d at 736-37. Based on defendant's conviction, it appears that the jury found Johnson's testimony credible. This was its prerogative in its role as the trier of fact. See *People v. Moser*, 356 Ill. App. 3d 900, 911 (2005).

¶ 53     Further, although Reeves made an in-court identification of defendant as the offender that she had seen in Latoya's living room, defendant argues that Reeves testimony is unreliable because she did not identify defendant in an initial photo array and her tentative identification of him in the subsequent line-up was tainted by the fact that defendant was the only person that she had previously been shown. However, even if we find Reeves' in-court identification of defendant insufficient, for purposes of reasonable doubt, Johnson's single positive identification was sufficient to support defendant's conviction. See *People v. Piatkowski,* 225 Ill. 2d 551, 566 (2007); see also *People v. Slim*, 127 Ill. 2d 302, 307 (1989) (holding that positive identification by a single witness who had ample opportunity to observe will support a conviction if the identification is not vague or doubtful).

¶ 54     Moreover, we note that although Price failed to identify defendant at any point during the investigation and during trial, she noted that she could not identify the second offender because he was wearing a green hat. Reeves similarly testified that she had difficulty identifying the second offender because he was wearing a hat when she observed him in Latoya's living room. Johnson's testimony confirmed that defendant was wearing a green hat on the day that he kidnapped Bridges.

¶ 55     Lastly, defendant argues that any motive he may have had in this case was injected by co-defendant and Johnson, who had a motive to falsely accuse him. We disagree. The testimony at trial, either directly or indirectly, supports the State's theory that defendant's motive in this case stemmed from his belief that Bridges had stolen from him. Price testified that a week before Bridges was kidnapped she accompanied him to a house. She observed him enter through the

side gate and down the gangway to the side of the house. Later, she noticed that Bridges had marijuana that she had not previously seen him with before entering the house. At trial, it was established that the home that Bridges entered belonged to Latoya, defendant's girlfriend. Johnson testified that about a week before Bridges' kidnapping, codefendant informed him that Bridges had broken into Latoya's apartment and stolen both marijuana and an Ipod that belonged to defendant. Johnson responded that Bridges asked him if he wanted to steal some marijuana from defendant, and he declined. Johnson also stated that during the beatings defendant mentioned that Bridges had stolen from him and Bridges told defendant that he would return what he had stolen. Additionally, Reeves testified that on May 14, 2007, she went to Latoya's apartment to replace a window that Latoya had reported broken after someone burglarized her apartment. Reeves also testified that when she entered Latoya's apartment she observed defendant standing over a man who was bleeding, and he told her that the man had broken into Latoya's apartment and stolen some electronics. Thus, although defendant challenges the evidence of motive in this case, we find that the testimonies of Price, Johnson, and Reeves indicates that defendant's involvement in Bridges' kidnapping stemmed from Bridges stealing from his girlfriend's apartment.

¶ 56    Accordingly, we find that the State presented sufficient evidence to find defendant guilty of aggravated kidnapping and decline his invitation to reweigh the evidence or substitute our judgment for that of the jury in reviewing his claims of insufficiency.

¶ 57                           Closing Arguments

¶ 58    We next address defendant's contention that he was denied the right to a fair trial where the State erroneously attempted to define the reasonable doubt standard for the jury, misstated the law regarding the presumption of innocence, impermissibly shifted the burden of proof to defendant, and misstated the facts regarding his identification. He argues that the cumulative

effect of these errors caused a "pervasive pattern of prosecutorial misconduct." Defendant further argues that any failure by trial counsel to preserve his closing argument claims of error was ineffective assistance of counsel. The State responds that a review of the evidence and the closing arguments in their entirety shows that each of the complained-of comments was not only proper as based on the evidence presented, but also occasioned directly by defense counsel's own closing argument.

¶ 59    Initially, we note that the parties disagree about the proper standard of review in regard to remarks made during closing argument. A review of the case law reveals a conflict among Illinois Supreme Court cases. In both *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), and *People v. Sims*, 192 Ill. 2d 592, 615 (2000), our supreme court suggests that we review this issue *de novo*, because the prosecutor's statements are reflected in the transcripts and are therefore undisputed, leaving only a legal question. Conversely, in *People v. Hudson*, 157 Ill. 2d 401, 441 (1993), our supreme court suggests that the trial court is in a better position to rule on objections during closing argument, and the standard is therefore abuse of discretion. We need not take a position in this case, as defendant's claim fails under either standard. See *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008) ("[W]e do not need to resolve the issue of the appropriate standard of review at this time, because our holding in this case would be the same under either standard.").

¶ 60    It is well established that prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994) (citing *People v. Pittman*, 93 Ill. 2d 169, 176 (1982)). During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel which clearly invite response, and comment on the credibility of witnesses.

*People v. Rader*, 178 Ill. App. 3d 453, 466 (1988). However, it is improper for a prosecutor to argue inferences or facts not based upon the evidence in the record. *People v. Johnson*, 208 Ill. 2d 53, 115 (2003). Typically, a timely objection and an instruction to the jury to disregard the improper evidence are sufficient to cure the error. *People v. Wolf*, 178 Ill. App. 3d 1064, 1067 (1989). In reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety, and remarks must be viewed in context. *Kitchen*, 159 Ill. 2d at 38.

¶ 61    We first address defendant's contention that the State erroneously attempted to define the reasonable doubt standard for the jury. "Attempts to explain the reasonable-doubt standard have been disfavored by the courts because 'no matter how well-intentioned, the attempt may distort the standard to the prejudice of the defendant.' " *People v. Burney*, 2011 IL App (4th) 100343, ¶ 67 (quoting *People v. Keene*, 169 Ill. 2d 1, 25 (1995)). However, both the prosecutor and defense counsel are entitled to "discuss reasonable doubt and to present his or her view of the evidence [presented] and to suggest whether the evidence supports reasonable doubt." *People v. Laugharn*, 297 Ill. App. 3d 807, 811 (1998). "A prosecutor may argue that the State does not have the burden of proving the guilt of the defendant beyond *any* doubt, that the doubt must be a reasonable one. Such an argument does no more than discuss the grammatical fact that the word 'reasonable' modifies the word 'doubt.' " (Emphasis in original.) *People v. Carroll*, 278 Ill. App. 3d 464, 467 (1996).

¶ 62    Defendant acknowledges that he failed to object to the alleged improper comment at trial, thus our review of this issue is limited to whether plain error occurred. Plain error review is appropriate where the evidence is closely balanced or the error affects a substantial right. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). A plain error analysis begins with the determination of whether error occurred. *Id.* at 184.

¶ 63    In regard to the burden of proof, the prosecutor stated:

> "The burden of proof is always with us. We welcome the burden of proof. And the burden is beyond a reasonable doubt.  It's not beyond all doubt. It's not beyond a shadow of a doubt. It's not beyond a scintilla of a doubt. It's beyond a reasonable doubt. It is up to you collectively to decide what that is."

¶ 64    We do not find that the prosecutor committed reversible error when it discussed the reasonable doubt standard during closing arguments. The focus of the comment was the fact that the word "doubt" is modified by "reasonable," and therefore finding defendant guilty "beyond all doubt," "a shadow of a doubt," or a "scintilla of a doubt" was not necessary to sustain a conviction. See *Carroll*, 278 Ill. App. 3d at 467. We find no impropriety in these.  Moreover, we note that several similar statements have been found not to impermissibly diminish or shift the burden of proof. See *People v. Thompson*, 2013 IL App (1st) 113105, ¶ 90 (" 'beyond a reasonable doubt isn't any doubt in the world, any crazy doubt' " (Emphasis omitted.)); *Burney*, 2011 IL App (4th) 100343, ¶ 66 (" ' ["]beyond a reasonable doubt["] does not mean ["]beyond all doubt ["] ' " and " 'Don't raise that bar higher than it needs to be ladies and gentlemen for the State to prove. It's not beyond all doubt.' "); *Laugharn*, 297 Ill. App. 3d at 810 (" 'Now, that's not beyond all doubt or any doubt, but beyond a reasonable doubt.' " (Emphasis omitted.)); *People v. Renslow*, 98 Ill. App. 3d 288, 295 (1981) (" 'Well it's not beyond all doubt; it's beyond a reasonable doubt. ' "). Here, the prosecutor sought to discuss the reasonable doubt standard in similar terms. The statements did not diminish the prosecution's burden of proof.

¶ 65    Defendant relies on *People v. Burman*, 2013 IL App (2d) 110807, to argue that that the prosecutor's comments were improper. In *Burman*, the prosecutor told the jury that " ' [w]e have to prove [defendant's guilt] beyond a reasonable doubt. However, it's not beyond all doubt. It's not beyond an unreasonable doubt.' " *Id.* ¶ 40. The appellate court admonished the prosecution

for its remarks, finding that they improperly defined reasonable doubt by "describing what it was not." *Id.* ¶ 44. We note that the holding in *Burman* stands in direct contrast to the several cases noted above; however, the *Burman* court held that a mere misstatement of the burden of proof, to any extent, does not amount to plain error, absent a finding that the comments were "either so inflammatory that the defendant could not have received a fair trial or so flagrant as to threaten a deterioration of the judicial process." (Internal quotation marks omitted.) *Id.* ¶ 45. Thus, even if we were to find the comments improper under *Burman*, defendant fails to show how these comments were egregious enough to amount to reversible error.

¶ 66 We further reject defendant's reliance on *People v. Turman*, 2011 IL App (1st) 091019, and *People v. Franklin*, 2012 IL App (3d) 100618, to show that the prosecutor's comment that reasonable doubt is "up to you to collectively decide" was an improper comment. In *Turman*, the jury asked for a " 'more explicit, expansive definition of reasonable doubt,' " and the circuit court responded: " '[R]easonable doubt is not defined under Illinois law. It is for the jury to collectively determine what reasonable doubt is.' " *Turman*, 2011 IL App (1st) 091019, ¶ 19. The appellate court held that this instruction constituted error. *Id.* ¶ 25. Similarly, in *Franklin*, the circuit court informed prospective jurors during *voir dire* that " '[beyond a reasonable doubt is] what each of you individually and collectively, as 12 of you, believe is beyond a reasonable doubt.' " *Franklin*, 2012 IL App (3d) 100618, ¶ 4. The appellate court majority in *Franklin* held that this instruction "was constitutionally deficient because, by telling jurors that it was for them to collectively determine what reasonable doubt meant, there is a reasonable likelihood that the jurors understood the instruction to allow a conviction based on proof less than [beyond] a reasonable doubt." *Id.* ¶ 28.

¶ 67 However, in *People v. Downs*, 2015 IL 117934, our supreme court recently found that the trial court's instructions to the jury that " '[w]e cannot give you a definition[;] it is your duty to

define,' " was an "unquestionably correct" statement of law. *Id.* ¶¶ 17, 23-24. Quoting this court's decision in *People v. Thomas*, 2014 IL App (2d) 121203, the supreme court found both *Turman* and *Franklin* "unpersuasive" on the point that "simply instructing jurors that they must determine the meaning of 'reasonable doubt' is (1) a violation of the Illinois Supreme Court's proscription against providing a definition or (2) reversible error *per se.*" (Internal quotation marks omitted.) *Downs,* 2015 IL 117934, ¶ 23. In accordance with our supreme court's holding in *Downs*, we find no error with the prosecutor's comment.

¶ 68    We next address the contention that the prosecutor misstated the law on the presumption of innocence in this case when the prosecutor commented that the evidence in this case "removed the cloak of innocence." A prosecutor may not misstate the law during closing arguments, as it can be grounds for reversal. *People v. Young*, 347 Ill. App. 3d 909, 925 (2004). We note that defendant failed to object to this comment at trial, and thus we review for plain error.

¶ 69    In discussing the presumption of innocence in this case, the State commented:

"In their opening statements a couple of days ago counsel for each defendant came up here and told you that their clients were innocent. And technically they're absolutely correct, because you've been told more than once that as they sat here when this trial started they are presumed innocent. Absolutely. Absolutely correct in that regard.  But just like the heat of that garage fire as it burned away the hair from Frentsi's scalp, as it burned away the skin from Frentsi's shoulders and arms, leaving only bone and muscle, as it literally burned off at least one of his extremities, the evidence in this case, it's like the heat that removes the cloak of innocence. With the witnesses that you've heard form over the last couple of days, witness by witness, that presumption of innocence that they started this trial with has been slowly burned away with each of them, exposing the true, vicious, violent criminals they were on May 14, 2007. "

¶ 70    We cannot agree with defendant that the prosecutor's statements were misstatements of the presumption of innocence. Rather, they were statements that defendant was guilty, worded in such a way as to respond to defendant's opening statement, and in anticipation of his closing argument. See *People v. Cisewski*, 118 Ill. 2d 163, 178 (1987) (Finding no error where the prosecutor stated, " 'Now is the time, Ladies and Gentlemen, to remove the cloak of innocence from this defendant' "); *People v. Tomes*, 284 Ill. App. 3d 514, 522-23 (1996) (Finding no misstatement regarding the presumption of innocence where, in response to defense counsel's argument that defendant was " 'wearing the presumption of innocence,' " the prosecutor stated, " 'It's correct that [the defendant] was presumed innocent before the trial began, he was cloaked in innocence as he sat over there. That was before you heard the evidence. The evidence is in ladies and gentlemen.' "). Therefore, we cannot find that the prosecutor's comments were improper. Because there was no error, plain error does not apply. Defendant's argument fails.

¶ 71    Further, we reject defendant's reliance on both *People v. Keene*, 169 Ill. 2d 1 (1995), and *People v. Brooks*, 345 Ill. App. 3d 945 (2004). In *Keene*, the prosecutor stated that the defendant's presumed " 'cloak of innocence' " had been " 'shredded and ripped and pulled [off]' " to reveal guilt. *Keene*, 169 Ill. 2d at 24. Our supreme court found that "the theatrical description of the stripping away of [the defendant's] presumption of innocence" was a misstatement of the law. *Id.* at 25-26. In contrast to *Keene*, in the instant case, the prosecutor did not simply say that the cloak of innocence was gone. Instead, the prosecutor told the jury that "the evidence in this case *** removes the cloak of innocence." Thus, the prosecutor accurately indicated that the presumption of innocence could be overcome by the evidence.

¶ 72    In *Brooks*, this court found that the prosecution misstated the law regarding the presumption of innocence when the prosecutor stated to the jurors in closing argument, " 'When you go back into the jury room, the presumption of innocence which [the trial court] told you

about as you were being selected as jurors and which you will receive in you jury instructions[,] that presumption, that cloak of innocence is gone.' " *Brooks*, 345 Ill. App. 3d at 950-51. The *Brooks* court noted that the prosecutor "did not indicate that after hearing the evidence the defendant was no longer cloaked in innocence," but rather, simply told the jury that the " 'presumption, that cloak of innocence [was] gone.' " *Id.* at 950. Here, in contrast, the prosecutor explicitly referred to the evidence overcoming the presumption of innocence. Therefore, *Brooks* is distinguishable.

¶ 73    Next, we address the contention that the State attempted to shift the burden of proof. It is axiomatic that an accused is presumed innocent and that the burden of proof as to his guilt lies, at all times, with the State. *People v. Lopez*, 152 Ill. App. 3d 667, 677 (1987). Consequently, the failure of the defendant to call, as witnesses, persons who may be aware of facts material to the question of his guilt or innocence cannot be commented upon by the State. *People v. Beller*, 54 Ill. App. 3d 1053, 1058 (1977). As a general rule, it is improper for the prosecution to comment on a defendant's failure to present witnesses when such witnesses are equally accessible to both parties. *People v. Eddington*, 129 Ill. App. 3d 745, 777 (1984).

¶ 74    In this case, the prosecutor stated:

"Do you remember the other two people in that car that were in the front seat; one was named Lionel, and one, we have no idea who the name was. Mariah said, I don't know him, I don't know Lionel. I only heard that name when they referred to each other. I don't know him and I've never seen him before. And the other person, Mariah said I'd never seen him before either. And the driver was fiddling on his phone, obviously setting up the kidnapping with those two people, and brining him over to the Dollar Store so those two people could come and abduct him. Mariah is just there watching, not knowing at all.  So the two people who could have told us specifically who the defendants were at

that moment on May 14 at 10:00 o'clock in the morning, well, the defendant may known them; unfortunately, the person who knew them in the car is dead, Frensti Bridges."

¶ 75    Here, we find that it was improper for the State to comment on the absence of testimony from the two men who were in the car with Mariah as she watched defendant being kidnapped from the dollar store. However, a review of the comment in its context reveals that defendant's attorney objected and the trial court sustained the objection and reminded the jury that "the burden always remains with the State." Thus, we find that the trial court effectively cured any prejudice to defendant. See *Wolf*, 178 Ill. App. 3d at 1067.

¶ 76    Lastly, we address defendant's contention that the State misstated the facts regarding his identification. Specifically, over defendant's objections, the prosecutor stated:

> "What are the chances that three different people who have no connection to each other, based on what you heard in this courtroom, would come in here and collectively identify the same two people?"

¶ 77    Later, in rebuttal, over defendant's objections, the prosecutor argued:

> "Because in addition to Mariah observing the defendants abduct her boyfriend off [the] street at 111th and Michigan, we have Leonardo Johnson.
>
> * * *
>
> Three separate individuals have three separate instances, have three different locations, and collectively they identify the same two people; [defendant] and [co-defendant], the two people on the video that abduct Frensti Bridges. *** Three people with three separate instances, in three different locations, at three different times in the morning on May 14, 2007, and yet, collectively they all identify the same two individuals."

¶ 78    We find that the prosecutor improperly misstated the identification evidence against defendant. Specifically, the State noted that the witnesses in this case "collectively" identified defendant and also stated that Price observed the defendants abduct her boyfriend. However, the record reveals that only Johnson made a positive identification of defendant prior to trial. Reeves then made an in-court identification of defendant. Thus, we find that the prosecutor's comments were improper. Nonetheless, we do not find that the improper comments necessitate reversal.  A review of the comments in context reveals that the trial court cured any prejudice to defendant's case by clarifying to the jury that Price never made a positive identification of defendant at any point during the trial and also reminding the jury after each statement to "rely on your own recollections of the evidence" in evaluating the closing statements.

¶ 79    Finding only two isolated instances where the prosecutor in this case made improper comments, we reject defendant's argument that a pervasive pattern of prosecutorial misconduct deprived him of a fair trial. Moreover, we acknowledge that immediately preceding closing arguments, the trial court instructed the jury that, "[c]losing arguments are made by the attorneys to discuss the facts and circumstances in the case and they should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded." Thus, we cannot say that these remarks affected the outcome of the defendant's trial, as the court provided sufficient instructions to preempt consideration of potentially improper comments as evidence. See *People v. Garcia*, 231 Ill. App. 3d 460, 469 (1992) (jury instruction regarding fact that arguments are not evidence tends to cure any prejudice from improper remarks); see also *People v. Taylor,* 166 Ill. 2d 414, 438 (1995) ("The jury is presumed to follow the instructions that the court gives it.").

¶ 80   Alternatively, defendant contends that any failure by trial counsel to preserve his closing argument claims of error was ineffective assistance of counsel. To prove a claim of ineffective assistance of counsel defendant is required to show both that his attorney's performance was deficient, and that, but for counsel's unprofessional errors, there is a reasonable probability that the results of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000). Here, we do not find that counsel was ineffective because the record reveals that counsel made prompt and reasonable objections to the potentially improper statements made by the prosecutor, specifically, the only two comments that we found improper. Moreover, we find that any failure of counsel to include a specific improper comment in a posttrial motion was likely due to the fact that the comment did not amount to error or the trial court effectively cured any potential for prejudice to defendant. Accordingly, the defendant's ineffective assistance claim fails under *Strickland*'s first prong.

¶ 81                          Verdict Forms

¶ 82   We next address defendant's contention that his aggravated kidnapping conviction and sentence must be vacated because trial counsel was ineffective for failing to request separate verdict forms on the different theories of murder. Specifically, he argues that if the jury was tendered a specific verdict form on felony murder, there would have been at least a reasonable probability for conviction on that charge. Defendant further argues that had the jury found him guilty of felony murder, the aggravated kidnapping verdict would have merged with the murder verdict, and the court could have ordered the 25 year sentence for the aggravated kidnapping conviction to run concurrently to his 60 year sentence for murder, instead of consecutively. However, because we reverse defendant's murder conviction, defendant's argument is no longer

germane to the disposition of this appeal. Moreover, we note that because the jury properly convicted defendant of aggravated kidnapping, independent of the murder charge, we find no reason to vacate the conviction.

¶ 83                                    Cost and Fees

¶ 84    Finally, defendant argues, and the State agrees, that this court should direct the trial court to vacate the $5 court system assessment and the $4 in assessments that were listed on the order for fines and fees without statutory authority.

¶ 85    The propriety of an order imposing fines and fees is a matter of statutory interpretation, which we review *de novo*. *People v. Price*, 375 Ill. App. 3d 684, 697 (2007).

¶ 86    First, we vacate the $5 electronic citation fee because defendant was not convicted of violating the Vehicle Code for which this fee can be imposed. See 705 ILCS 105/27.3e (West 2012) (a $5 fee "shall be paid by the defendant in any traffic, misdemeanor, municipal ordinance, or conservation case"). Next, the order assessing fines and fees contained two unidentified $2 assessments that were handwritten on the form. One of the assessments is for "St fund," and the other is for "PD fund." However, no statutory authority exists for these assessments, and these assessments should be vacated. *People v. Wade*, 116 Ill. 2d 1, 6 (1987).

¶ 87    Thus, pursuant to Illinois Supreme Court Rule 615(b)(1) (eff. January 1, 1967), and our authority to correct a mittimus without remand (*People v. Rivera*, 378 Ill. App. 3d 896, 900 (2008)), we order the clerk of the circuit court to correct the fines and fees order to reflect the vacation of the $5 electronic citation fee and $4 in statutorily unauthorized assessments, resulting in an assessment balance of $660.

¶ 88                                    CONCLUSION

¶ 89     For the foregoing reasons, we reverse the trial court's conviction for first degree murder.

We also modify the mittimus to reflect an assessment balance of $660.

¶ 90     Affirmed in part; reversed in part. Mittimus corrected.